L. R. BROOKS, Appellant, *v.* ARCHIE J. DEWAR, Et Al., Respondents

October 24, 1940.                    106 P.(2d) 755.

No. 3287

*Norman M. Littell,* Assistant United States Attorney-General, *Miles N. Pike,* United States District Attorney for Nevada, and *Charles R. Denny, Vernon L. Wilkinson,* and *William B. Holst,* Attorneys Department of Justice, for Appellant.

*Milton B. Badt* (*Donovan, Leisure, Newton & Lumbard, William J. Donovan, Carl E. Newton, Hiram E. Wooster,* and *John Howley,* of counsel), for Respondents.

## OPINION

By the Court, TABER, C. J.:

The act of Congress commonly known as the Taylor grazing act was approved June 28, 1934. C. 865, 48

Stat. 1269. It is entitled, "An Act to stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes." As amended and added to, the act will be found in U. S. C. A., Title 43, c. 8A, secs. 315–315p.

The first sentence of section 1 provides, in part: "That in order to promote the highest use of the public lands pending its final disposal, the Secretary of the Interior is authorized, in his discretion, by order to establish grazing districts or additions thereto and/or to modify the boundaries thereof, not exceeding in the aggregate an area of eighty million [amended June 26, 1936, to read "one hundred forty-two million"] acres of vacant, unappropriated, and unreserved lands from any part of the public domain of the United States (exclusive of Alaska), which are not in national forests, national parks and monuments, Indian reservations, * * * and which in his opinion are chiefly valuable for grazing and raising forage crops * * *."

Section 2 reads: "The Secretary of the Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of the foregoing section, and he shall make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this Act [chapter] and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range; and the Secretary of the Interior is authorized to continue the study of erosion and flood control and to perform such work as may be necessary amply to protect and rehabilitate the area subject to the provisions of this Act [chapter], through

such funds as may be made available for that purpose, and any willful violation of the provisions of this Act [chapter] or of such rules and regulations thereunder after actual notice thereof shall be punishable by a fine of not more than $500."

Section 3: "That the Secretary of the Interior is hereby authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range, upon the payment annually of reasonable fees in each case to be fixed or determined from time to time: Provided, That grazing permits shall be issued only to citizens of the United States or to those who have filed the necessary declarations of intention to become such, as required by the naturalization laws and to groups, associations, or corporations authorized to conduct business under the laws of the State in which the grazing district is located. Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the live-stock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of lands, water or water rights owned, occupied, or leased by them, except that until July 1, 1935, no preference shall be given in the issuance of such permits to any such owner, occupant, or settler, whose rights were acquired between January 1, 1934, and December 31, 1934, both dates inclusive, except that no permittee complying with the rules and regulations laid down by the Secretary of the Interior shall be denied the renewal of such permit, if such denial will impair the value of the grazing unit of the permittee, when such unit is pledged as security for any bona fide loan. Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time

numbers of stock and seasons of use. During periods of range depletion due to severe drought or other natural causes, or in case of a general epidemic of disease, during the life of the permit, the Secretary of the Interior is hereby authorized, in his discretion to remit, reduce, refund in whole or in part, or authorize postponement of payment of grazing fees for such depletion period so long as the emergency exists: Provided further, That nothing in this chapter shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacturing, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereafter initiated or acquired and maintained in accordance with such law. So far as consistent with the purposes and provisions of this chapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in or to the lands."

By executive order of the president, November 26, 1934, No. 6910, the public lands of Nevada were withdrawn from settlement, location, sale, or entry, and reserved for classification pending the determination of the most useful purpose of such lands under said act. Thereafter grazing districts were established in many western states, including Nevada. Nevada grazing district No. 1, embracing Elko County and that portion of Eureka and Lander Counties north of the Humboldt river, was established April 8, 1935, by order of the secretary of the interior. Respondents, plaintiffs in the court below, are graziers in this district.

On May 31, 1935, the director of grazing, acting under said sec. 2, promulgated certain rules requiring all persons grazing their livestock within grazing districts to obtain temporary licenses. These rules did not

require payment of any license fees, and there were no fees for the year 1935. Under said rules, plaintiffs applied for and obtained temporary licenses, and these licenses were thereafter extended.

Upon call of the secretary of the interior, a conference of delegates from each of the grazing districts theretofore established was held at Salt Lake City January 13 and 14, 1936. The director of grazing asked the assembled delegates to advise him whether fees should be charged for new temporary licenses, and if so, what the amount of the fees should be. The director suggested a uniform fee of 5 cents per month for each head of cattle and 1 cent per month for each sheep. Many delegates, and especially those from Nevada grazing district No. 1, objected to the imposition of such fees, upon three grounds: (1) that the grazing act did not authorize the secretary to charge any fees whatsoever for temporary licenses; (2) that, as the conditions of various portions of the public range differed greatly from one another, all stockmen should not be charged the same uniform fees regardless of the public range where they grazed their livestock; and (3) that, for certain portions of the public range, especially those situated in Nevada grazing district No. 1, such fees would be utterly unreasonable because, under conditions then existing, the privilege of grazing livestock on such portions of the public range was not worth the payment of such fees, and because the payment thereof would not permit stockmen situated like the plaintiffs to sell their livestock at a profit or to meet competitive conditions, or to obtain the credit necessary to operate their businesses. The director of grazing, however, found that a majority of the delegates were in favor of charging such fees. Plaintiffs' complaint alleges that the director did not attempt to determine the reasonableness or unreasonableness of such fees as applied to particular portions of the public range.

The director of grazing, on March 2, 1936, promulgated "Rules for Administration of Grazing Districts,"

which will herein be sometimes referred to as the rules of March 2, 1936. Among other things, these rules provided: (a) That the division of grazing of the department of the interior should issue to certain qualified applicants new temporary licenses to graze livestock upon the public range within the grazing districts theretofore established until the end of the "winter grazing season" of 1936–1937 or until May 1, 1937, or until the issuance of "permits" within the meaning of section 3 of said act of June 28, 1934, whichever should be sooner; (b) that a fee of 5 cents per month or fraction thereof for each head of cattle, and a fee of 1 cent per month for each head of sheep, should be collected from each licensee grazing his livestock on the public range within a grazing district; and (c) that, after the issuance of said new temporary licenses, all stockmen should be prohibited from grazing livestock upon or driving them across the public range within a grazing district without such a license.

The first two paragraphs of the rules of March 2, 1936, read as follows:

"Permits within the meaning of section 3 of the act of June 28, 1934 (48 Stat. 1269, 43 U. S. C. A., secs. 315–315p), shall be issued as soon as the necessary data are available upon which to ascertain the proper use of the lands and water which entitle their owners, occupants or lessees to a preferential grazing privilege.

"During the intervening period, temporary licenses will be issued under authority of section 2 of said act to provide for the existing livestock industry using the public lands in such districts."

Owing, as plaintiffs allege, to the necessity of protecting their livestock from injury, they applied for new temporary licenses. On or about May 1, 1936, the register of the district land office notified plaintiffs that new temporary licenses would be granted them upon payment of the first installments for the grazing season of 1936–1937. On May 25, 1936, defendant Brooks notified plaintiffs and other applicants for new temporary

licenses that unless they paid the first installments of their 1936–1937 grazing fees and obtained their new temporary licenses by June 15, 1936, they would be considered in trespass under the provisions of said grazing act, and would be punished by a fine of not more than $500 as provided therein.

The complaint, which is lengthy, further alleges that in fixing the fees for temporary licenses no attempt was made "to ascertain the character of the public range used in any particular case, the type of feed thereon, the distribution thereof of water available for livestock, the economic condition of the particular stockmen dependent thereon, the respective abilities of the stockmen dependent thereon to meet commercial competition, the existing market prices for the various types of livestock, the distance of such range from shipping facilities, or any other standard of reasonableness in each case."

It is further alleged that the various portions of the public range within the several grazing districts differ so widely in quality and general characteristics that a fee which is reasonable as to one grazing district is not reasonable as to another, and a fee which is reasonable as to one portion of a given grazing district is not reasonable as to another portion of the same district.

Paragraph 6 of the complaint reads as follows: "In general, the public range in Nevada is the most dependent upon appropriated water and companionate agricultural and grazing lands of any public grazing lands in the United States. The portions of the public range on which plaintiffs graze their livestock are wholly dependent upon appropriated water and companionate lands for economical and beneficial use, and it is necessary to invest large sums in improvements of headquarters units, water rights, winter feed facilities, etc., before livestock can be raised successfully. Most of the cattle produced by plaintiffs and other stockmen similarly situated are what is known as 'feeders,' that is, cattle

which must be fattened in some other section of the country before they are fit for slaughter. Furthermore, because of the erratic production of feed on Nevada ranges due to semi-arid climatic conditions and the great extreme of changes in temperature and moisture, on the average less than twenty out of every hundred head of cattle raised can be marketed as feeders each year and the receipts from these cattle must pay for the expense of supporting the entire one hundred head. The sheep raised by plaintiffs and others similarly situated must be ranged on special lambing grounds in spring; must be 'lambed' before shearing or shorn before 'lambing', depending entirely on weather conditions; must be taken to the higher mountains for summer range; the lambs shipped to market in fall; the ewes trailed to the winter range depending while on the trail on snow for watering, and in spring again trailed north for shearing and lambing. Such perennial trailing to and from one winter range, and such shearing and lambing in adverse weather conditions, often subjects the bands of sheep to losses ranging from a small percentage to as great as seventy-five per cent. In addition to such adverse conditions, when the steers thus raised and the lambs thus raised are ready for market, they must be disposed of irrespective of the prices offered for same. The margin of profit, by reason of such conditions, both as to sheep and cattle, is so small that the imposition of additional charges of overhead or operating costs, even though appearing nominal, threaten to destroy said industries in the said Grazing District No. 1.''

It is also pointed out in the complaint that the licenses required by the rules of March 2, 1936, are temporary and revocable without any qualifications or restrictions upon such right of revocation, whereas section 3 of the grazing act requires that permits shall be for a fixed period; that none of the new temporary licenses carries with it any right of renewal, whereas said section

3 provides that permittees complying with the secretary's rules and regulations shall not be denied renewal of their permits if such denial will impair the value of the grazing units when pledged as security for bona fide loans; and that plaintiffs' water rights are jeopardized because the temporary licenses are revocable without qualification or restrictions as aforesaid.

The district land office has refused to issue plaintiffs their new temporary licenses unless and until the required fees be paid, and defendant has threatened to prevent plaintiffs from grazing their livestock on those portions of the public range in Nevada grazing district No. 1 heretofore for many years used by them for that purpose, unless such fees be paid; he has further threatened that if plaintiffs attempt to so graze their livestock without payment of the fees, they will be subject to an action for trespass and to a fine of not more than $500 and to the other liabilities and penalties provided in the grazing act.

Subdivision (c) of paragraph 17 of the complaint alleges that: "If plaintiffs are forced to pay the grazing fees assessed against them under said illegal and void Rules of March 2, 1936, under protest, and to rely on their ability to recover back the sums so paid from the defendant Brooks, or from the various federal, state and local authorities who receive the proceeds thereof, the plaintiffs will suffer great inconvenience and expense in conducting their businesses during the coming year, and, as to some of the plaintiffs, their businesses will be disrupted entirely, and it will be impossible for such plaintiffs to obtain the money necessary to operate their businesses during the coming year. Each and every one of the plaintiffs, for the purpose of meeting his overhead expenses and operating costs and expenses in the said business of raising and selling livestock, is strictly limited to definite sources of income. As to a large group of said plaintiffs, they are, and each of them is, financed through borrowed money lent to them by the Regional Agricultural Credit Corporation

of Salt Lake City, Utah, the Nevada Livestock Production Credit Association, or other similar governmental loan agencies engaged in the business of lending funds of the Reconstruction Finance Corporation of the United States of America, by accepting the notes of said plaintiffs in said class and rediscounting the same with the said Reconstruction Finance Corporation, the Federal Reserve Bank, the Federal Intermediate ·Credit Bank, or other government bank· agencies. Such funds, lent as aforesaid for overhead and operating costs, are limited by what is known as a 'Budget Allowance' set up and fixed at the beginning of the loan term, and are allowable and payable in fixed, agreed amounts monthly during. said term, and no funds in excess of said budget allowances are available to such plaintiffs. At the time the budgets were fixed and allowed for all plaintiffs in said class, no attempt had been made to levy or to collect any grazing fees as a condition precedent to the right of said plaintiffs to graze their livestock on the public range, and, accordingly, no such item of grazing fees was or is provided for in such budgets. Such plaintiffs in such class have no other means of income and are therefore unable to pay said grazing fees. As to the remainder of said plaintiffs, not financed as aforesaid through such government loan agencies, their sources of revenue for payment of overhead and operating expenses are nevertheless limited to fixed and definite available sums. Such sums in like manner as the available funds of those plaintiffs financed through Government agencies as aforesaid, are definitely allocated to definite overhead or operating expenditures, and there is no surplus or overplus after such allocation and application. Such plaintiffs are entirely unable to pay the said grazing license fees."

It is further alleged that should defendant attempt to enforce the said rules subjecting each of the plaintiffs to a fine and other penalties and barring them from grazing their livestock as aforesaid, "plaintiffs' livestock will die of starvation, and plaintiffs will lose the large sums

of money which they have invested in said livestock, and in agricultural and grazing lands, improvements, water rights, dams, ditches, canals, reservoirs, dipping vats, and other real and personal property."

Defendant demurred to the complaint upon the grounds that (1) it failed to state a cause of action, (2) the secretary of the interior is an indispensable party defendant, (3) the United States is an indispensable party defendant since its property rights are involved, and (4) the court was without jurisdiction because the action is in essence a suit against the United States which has not given its consent to be sued. The demurrer was overruled, and defendant elected not to plead further. Thereupon his default was entered, and the court adjudged that the director of grazing and the secretary of the interior had no authority to promulgate the rules requiring plaintiffs to pay the fees as set forth in said complaint as a prerequisite to grazing their livestock under the temporary licenses, and enjoined defendant "from barring, or threatening to bar, plaintiffs from grazing their livestock upon the public range within Nevada Grazing District No. 1 in default of payment of the grazing fee of 5 cents per month or fraction thereof per head of cattle, and 1 cent per month or fraction thereof per head of sheep, grazed upon such public range and in default of obtaining a new temporary license as required by said rules of March 2, 1936."

■ The first point urged on this appeal is that the trial court erred in holding that the United States was not an indispensable party defendant, and in holding that it had jurisdiction over the action which, appellant contends, was in essence a suit against the United States without its consent. With this contention we do not agree. United States v. Dewar et al., D. C., 18 F. Supp. 981; Ferris v. Wilbur, 4 Cir., 27 F. (2d) 262; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Work v. Louisiana, 269 U. S. 250, 46 S. Ct. 92, 70 L. Ed. 259.

■ Nor do we find merit in appellant's second specification of error, that the district court erred in holding that the secretary of the interior was not an indispensable party defendant. State of Colorado v. Toll, 268 U. S. 228, 45 S. Ct. 505, 69 L. Ed. 927; 28 Am. Jur. 453, section, n. 12.

Appellant's third and last specification of error is that the lower court erred in holding that the complaint stated facts sufficient to constitute a cause of action. This specification is based upon the contention that the grazing officials had the authority, under section 2 of the grazing act, and independent of section 3 thereof, not only to issue temporary licenses and collect grazing fees, but also to collect the very fees prescribed by the rules, to wit, 5 cents per head per month, or fraction thereof, for each head of cattle or horses, and 1 cent per month, or fraction thereof, for each sheep or goat.

In support of appellant's position, it is pointed out that delegations of power such as that in section 2 of the grazing act should be broadly construed in order to effectuate the policy and intent of Congress; that besides the wording of the act itself, the court, in endeavoring to ascertain the intent of Congress, should consider the history and purposes of the act; that, in providing for the issuance of temporary licenses and collection of fees, the secretary of the interior is not acting under section 3 of the act but under section 2 thereof, and that such action is the only effective means of beginning to carry out the policy and intent of Congress; that in the case of United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563, language very similar to that of section 2 was held by the supreme court of the United States to authorize the charging of fees for the privilege of grazing livestock in the national forests; that it must have been apparent to Congress that before the grazing act could be administered on a permanent basis, considerable time would elapse; that prompt action was essential in order to protect the

public domain from present evils and abuses; that it was imperative that the temporary licenses be revocable and carry no right of renewal, because they were to be replaced by permits under section 3, and it was impossible to foretell when that would be; that the language of section 2 is mandatory, while that of section 3 is discretionary; that the issuance of temporary licenses is not expressly prohibited either in section 3 or elsewhere in the act; that the act should not be interpreted so as to tie the hands of the secretary while the necessary data are being collected and studied to afford a basis for the issuance of permits under section 3; that notwithstanding the secretary was not obliged to follow the procedure set forth in section 3 for fixing the fees to be charged for the temporay licenses, he nevertheless took great care to make sure that the fees would be reasonable by adopting the rates voted by a majority of the hundreds of delegates from the eleven western states at the Salt Lake conference, thus showing that his action was not arbitrary or capricious, but rather an honest endeavor to begin to fulfill the mandate of Congress as required by section 2 of the grazing act; that whether the fees are reasonable or not in any given case is not to be determined by what someone else is paying, but what is being paid in the particular case; that if any piece of land is worth grazing on at all, it is worth at least 1 cent an acre for sheep and 5 cents an acre for cattle; that the fees collected go right back into the ranges for their improvement and rehabilitation and in order to get the data requisite for the issuance of permits under section 3; that, while some grazing areas are better than others, it must be remembered that more livestock per acre are grazing on such lands than on others where there is less forage, and for this reason it makes no difference whether or not one licensee has better grazing land than another, because the one having the better grazing land grazes more livestock, so that the matter of the reasonableness of the fees equalizes itself; that it makes no difference whether the fees

are reasonable in each case or not if they are authorized under section 2; that, in construing the grazing act, the court should bear in mind some of the practical problems with which the secretary was faced; that, after ascertaining which public lands out of the total of 173,000,000 acres were "chiefly valuable for grazing and raising forage crops," he was to set up grazing districts embracing not to exceed 80,000,000 acres; that more than 15,000 persons had been using the public range, grazing thereon more than 8,000,000 livestock annually; that in order to comply with the provisions of section 3, it was necessary to determine which of these persons had priority rights and to what extent; that the capacity of the range in many places had been impaired, and that if these lands were to be restored, and inauguration of protective and rehabilitation measures was immediately necessary, and in the meantime if these ranges were not to be destroyed or the livestock industry disrupted, some temporary modus operandi had to be devised; that the reason of the law should prevail over its letter; that the meaning of parts of a statute should be controlled by the general intent of the whole act; and that the contemporaneous and considered interpretation of an act by the administrative agency charged with its enforcement is not to be lightly disturbed by the courts.

As a further extrinsic aid to construction, appellant urges that temporary licenses and the grazing fees fixed by the rules of March 2, 1936, have been ratified by Congress. In the first place, Congress, knowing that the public range was being administered by the secretary of the interior under the temporary license system and on a fee basis, has for several years appropriated money for range improvements on the basis of the amount of fees collected in the several grazing districts, such fees being the only moneys collected under the authority of the grazing act prior to 1939. Secondly, Congress, in June 1936, knowing that the division of grazing was operating under a temporary license and

fee system, widened the scope of section 1 of the act by extending its provisions to a further 62,000,000 acres of the public domain, and at the same time amended four other sections of the original act, but left sections 2 and 3 unchanged, though aware of the construction which had been placed on them by the secretary.

Respondents, on the other hand, defending the action of the lower court in overruling defendant's demurrer, contend that section 2 cannot be construed to confer authority to charge fees, because section 3 confers a specific and strictly limited grant of authority so to do; that where an act contains both general and specific provisions relating to a particular subject, the specific provisions must govern in respect to that subject, and this is true even though the general provisions, standing alone, might be broad enough to include the subject to which the more particular provisions relate; that the rules of March 2, 1936, establishing uniform fees throughout the entire public range, violate that provision of section 3 which requires that the fees are "in each case to be fixed or determined from time to time"; that the licenses, being temporary and revocable, do not provide the stockmen with the certainty of tenure intended by section 3; that under the temporary licenses the rights of renewal conferred by the provisions of section 3 have been ignored and destroyed; that the valuable water rights which, under the provisions of section 3, are not to be diminished or impaired, can be destroyed at any time under the temporary licensees; that the forest reserve act, construed by the supreme court of the United States in the case of United States v. Grimaud, supra, conferred only a general power to regulate, and contained no provisions like those in section 3 of the grazing act limiting and qualifying the procedure to be followed if the secretary should choose to license the use of the range; that if section 2 authorizes the secretary to charge the fees prescribed by the rules of March 2, 1936, section 3 might as well never have been

written; that even if the secretary was compelled to take steps to protect the range pending the organizing of a permanent system of administration, it cannot be said that it was necessary for him to violate the provisions of section 3 by charging fees for grazing privileges which do not comply with that section.

Respondents point out that the purpose of the grazing act, as stated in the preamble, is not only "to stop injury to the public grazing lands by preventing overgrazing and soil deterioration," and "to provide for their orderly use, improvement, and development," but also "to stabilize the livestock industry dependent upon the public range." They argue that the effect of those portions of the rules of March 2, 1936, which they claim to be invalid is rather to make the livestock industry unstable.

Regarding the reasonableness of the fees, respondents say that the maintenance of competitive conditions between stockmen using the semiarid lands of Nevada and the stockmen in more fertile states requires the payment of fees commensurate with the grazing value of the public land that is used; that over an area of 162,-000,000 acres of land in eleven states, where some of the range is meadow land or fine bunch grass, while other portions are salt grass or alkali flats, the uniform 5-cent and 1-cent rates cannot be "reasonable in each case." Respondents further call attention to the fact that appellant, by electing not to answer their complaint in the court below, admitted all the material facts therein alleged, including the allegations which, as contended by respondents, show that the fees were unreasonable as to each and all of them.

In appellant's opening brief, counsel refer to the report which Mr. Taylor made in introducing the grazing bill in the house of representatives. 78 Cong. Rec., Part V, pp. 5370–5376. In respondent's brief, counsel quotes from the same report as follows: "Returning to the bill before us I may say this bill originally started

with about a dozen lines, just putting all this public domain under the jurisdiction of the Interior Department, to be administered for the general welfare of the Government and for the public good. But we have been adding to it all the time until now the bill contains 10 pages, consisting quite largely of just unnecessary regulations written into the bill. The secretary could do practically everything that is provided for in the bill if we had simply turned it over to him. Nearly all these things could be provided for by regulations. However, many people are not willing to give just carte blanche provisions of that kind in the bill. They, with some justification, feel that there are some things that they should specifically provide for or reserve in the law itself for their guaranty." 78 Cong. Rec., Part V, p. 5372.

On the oral argument of this case it was stated by counsel for appellant that Mr. Taylor had said it might take forty, fifty, or sixty years to put all the grazing lands under administration. Counsel did not think this statement well founded, and stated that permits under section 3 were already being issued in Colorado and New Mexico. On the other hand, the act was passed in June 1934, and respondents' counsel point to the fact that in Nevada grazing district No. 1 the system of temporary licenses is still being employed after six years, and no one can tell how long it will be until permits will be issued in that district. Respondents do not question the right of the secretary, under section 2, to make rules and regulations as to when stock may and may not graze on the range, where the different kinds of stock may be grazed, and as to following proper range practices in handling the stock. They insist, however, that in making such rules and regulations, the secretary does not have the right to ignore section 3 or to act entirely independent of that section.

Finally, respondents controvert appellant's contention that the license fees complained of have been ratified by congressional appropriation acts, or by Congress

amendment, in 1936, of various sections of the grazing act other than sections 2 and 3, while leaving these two sections unchanged.

■■ Where the language of a statute is plain, certain and free from ambiguity, judicial construction is unnecessary. But the intention of Congress, as regards the charging of fees for grazing livestock on the public range, is not clear in all respects. We have to consider, on the one hand, the decision of the United States supreme court in the case of United States v. Grimaud, supra, construing a provision in the national forests act, 16 U. S. C. A. secs. 473–482, 551, very similar to section 2 of the grazing act, as well as the history and purpose of the latter act, the evils to be remedied by it, and the action of Congress in making appropriations from year to year based on estimates of sums to be collected from the users of the public range. On the other hand, it must be borne in mind that the national forests act contained no such special provision relating to the payment of fees as we find in section 3 of the grazing act. It is not for this court to say whether it would have been better had Congress specially provided that the secretary, in the matter of charging fees, could proceed under section 2 without regard to section 3 until such time as sufficient data could be gathered upon which to issue permits and collect fees under the provisions of the latter section. In construing either of these sections, we are not at liberty to disregard the provisions of the other. In seeking the legislative intent, we must look at the whole act, giving effect, if possible, to all its parts and endeavoring to harmonize them.

■ In a very recent decision of the United States district court for the district of Nevada it was held that the rules on March 2, 1936, insofar as they purported to authorize the collection of fees based on the uniform 5-cent and 1-cent rates, were void. United States v. Achabal, 34 F. Supp. 1. As the grazing act is an act of Congress, the Achabal case is entitled to great weight

as persuasive authority. Black's Law of Judicial Precedents, sec. 113, p. 374; United States Law Review, September, 1935, vol. LXIX, pp. 449–454; 14 Am. Jur. 339, sec. 121; 21 C. J. S., Courts, p. 377, sec. 206. Whether the Achabel case is absolutely binding on this court need not be determined, because the conclusion arrived at in that case is not at variance with that to which we have come after an independent considertion of the questions presented in the case at bar.

■ Under section 2 rules may be adopted, consistent with other provisions of the statute, for the prevention of such evils as overgrazing, for improving range conditions, fixing range boundaries, prescribing the areas which may or may not be grazed, who may make use of the range, the areas which may be grazed by the different kinds of livestock, setting the opening and closing dates of the grazing seasons for cattle and for sheep, requiring proper range practices in handling livestock, and prescribing other regulatory measures. But the charging of fees is not essential to regulation, and even if it be conceded that section 2 authorizes not only the issuance of temporary licenses but also the collection of fees for grazing livestock on the public range, a careful study of the grazing act shows, in our opinion, an intention on the part of Congress that all fees collected must be "reasonable fees in each case to be fixed or determined from time to time." We do not feel at liberty to read into the statute a provision that fees fixed upon any other basis may be collected for an indefinite number of years until the desired data be collected for issuing permits and collecting fees under section 3.

■ Appellant contends that as section 3 merely *authorizes* the issuance of permits upon the payment of reasonable fees in each case, it is discretionary with the secretary whether he will proceed under that section, and that he is thus left free, on the authority of United States v. Grimaud, supra, to charge fees under section 2, independently of the limitations in section 3. We do

not so read the statute. In our opinion, the authority to issue permits "upon the payment annually of reasonable fees in each case to be fixed or determined from time to time" excludes the right to collect grazing fees not based on a system conforming to that limitation.

■ Whatever may be said in favor of the uniform rates approved by a majority of the delegates to the Salt Lake City conference, they do not conform to the limitations prescribed in section 3. The idea of fees determined on the basis of uniform rates for livestock grazing on the millions of acres of public range land scattered throughout eleven western states, without taking into consideration the different conditions to be found in various portions of this vast domain, cannot be reconciled with the idea of "reasonable fees in each case to be fixed or determined from time to time." It is a matter of common knowledge among the stockmen of the far western states that the base rates on grazing fees in the national forests are not the same in every national forest, either for cattle or sheep. The fact that more livestock are allotted to areas producing good forage than to grazing areas of poorer quality does not operate to equalize the matter of reasonableness of grazing fees. Other factors must be taken into consideration, some of which have been mentioned in the complaint in this action and in the opinion of Honorable Frank H. Norcross in the Achabal case.

■ In the lower court, defendant did not move to strike out any part of the complaint as being irrelevant or immaterial. N. C. L. 1929, sec. 8623. Having elected to stand on his demurrer, every relevant and material fact alleged in the complaint must be accepted as true. As we are of the opinion that the complaint states facts sufficient to constitute a cause of action, that the trial court had jurisdiction of the person of the defendant and of the subject matter of the action, and that there is no defect of parties defendant, the judgment appealed from must be affirmed.

The court does not hold, as matter of law, that section 2 of the grazing act does not authorize the issuance of temporary licenses or the charging of grazing fees; nor do we determine whether, under the provisions of that section, some system of temporary licenses and payment of fees can be devised which, even if not entirely perfect, will yet be consistent with section 3. The action of Congress in making appropriations based on estimates of fees to be collected under the licensing system lends considerable support to the view that Congress has ratified the issuance of temporary licenses and the charging of fees to the licensees for grazing their livestock on the public domain; but even if this view were to be accepted, nothing has been presented in this case which would justify us in going further and holding that, regardless of and contrary to the provisions of section 3, the fees could legally be based upon the uniform rate prescribed by the rules of March 2, 1936, or that any part of said rules can be held valid if inconsistent with that section or any other provisions of the grazing act.