## A. C. FREEMAN, APPELLANT, *v.* LOUIS SOUKUP, RESPONDENT.

No. 3741

December 28, 1953.                    265 P.2d 207.

*Samuel Platt,* of Reno, for Appellant.

*Oliver C. Custer,* of Reno, *Hardin Barry,* of Susanville, California, and *Richard Maxwell,* of Klamath Falls, Oregon, for Respondent.

## OPINION

By the Court, BADT, J.:

The trial court awarded the plaintiff a judgment of rescission of a contract to purchase certain ranch property from the defendant for $175,000 and for a return of plaintiff's $25,000 down payment, upon the ground of defendant's false and fraudulent misrepresentations of fact, upon which plaintiff relied and which were made for the purpose of inducing plaintiff to enter into the contract. Defendant has appealed from the judgment and from the order denying new trial.

Although his 86-page opening brief lists nine assignments of error, discussed under 14 separate topic headings, it is apparent that his main contention is that there is entirely lacking from the case made by plaintiff the essential element of plaintiff's reliance upon defendant's representations. Appellant insists that the record shows without contradiction "that plaintiff-respondent relied upon record facts and his own personal investigation, and not upon oral conversation or representation." Upon the facts of the case and for the reasons below given, we hold that appellant's contention is unfounded, and that his other assignments of error are without merit. We continue to refer to the parties as plaintiff and defendant respectively.

On May 25, 1950 plaintiff and defendant entered into an agreement for the purchase by plaintiff from defendant of the Smoke Creek Ranch and other ranch and range lands in the vicinity owned by defendant in Washoe County, Nevada, and Lassen County, California, for $175,000 and for the further purchase of defendant's livestock and equipment at a price to be agreed upon

later. Plaintiff had 90 days to complete the purchase. The only written evidence of the transaction was a check drawn by plaintiff to defendant for $25,000, on the back of which was endorsed: "This down payment of $25,000 on the Smoke Creek Ranch, balance of $150,000 to be paid upon satisfactory examination of all papers and delivery title to me free of all [indebtedness]. Stock & equipment to be sold on price agreed upon. Purchaser has ninety [days] to complete purchase." Under this memorandum defendant endorsed his name and cashed the check. Although no contract was ever entered into for the purchase of the cattle, horses and equipment, it appeared that the entire deal for all of the real and personal property would have involved a sum of over $400,000.

The execution of the $25,000 check and memorandum endorsed thereon was the culmination of a number of meetings between the parties. Plaintiff was looking for a ranch and cattle property and learned through a Reno realtor, in December, 1949, that defendant's property was for sale. He telephoned defendant from Reno and pursuant to agreement met him at the ranch next morning. He again visited the ranch with defendant in February, 1950. The extent of his observation and examination of the property on those two occasions is discussed later. Defendant first put a price of $340,000 on the ranch. He later reduced this to $275,000, and still later to $175,000, with a $75,000 down payment. The final deal was, as above noted, for $175,000 with a $25,000 down payment.

On May 31, 1950, pursuant to defendant's request for a further payment, plaintiff made out a second $25,000 check and caused it to be mailed to defendant with an earnest money receipt indicating that this was a further payment upon the ranch. On June 6 or 7, 1950 plaintiff again visited the property with two expert and experienced ranch and livestock men and as a result of this inspection and of their advice pursuant thereto,

stopped payment on the check[1] and immediately thereafter gave defendant a written notice of the rescission of the contract with a demand for a return of his $25,000 down payment, reciting as his reasons his discovery of the falsity of sundry representations made by defendant concerning the property. Upon defendant's insistence upon the terms of the contract, plaintiff commenced the action for rescission.

The specific items of alleged misrepresentation pleaded in plaintiff's second amended complaint, upon which the issues were drawn, and the actual facts existing contrary to such representations and the respective findings of the court with reference to each separate issue may be summarized as follows:

(a) Plaintiff represented that the ranch had a Taylor Grazing permit[2] to run 2,850 head of cattle on the public

[1] Defendant testifies that he refused to accept this second check because it was not in accordance with the contract; that no further payment on the ranch was due at that time; that the only payment due was a payment on the livestock, equipment, etc., if plaintiff concluded to purchase the same. The dispute on the point is immaterial to the case. Plaintiff's drawing and forwarding the second check is important only insofar as it is claimed to be a waiver of reliance upon defendant's representations, and a ratification of the contract. This is discussed later.

[2] The various elements required for a cattle raising operation include (1) the ownership of a "base property" furnishing sufficient feed to winter the cattle (including the required equipment); (2) the cattle herd; (3) range land upon which the livestock graze during the grazing season. In the usual case such range land in this state is public domain. Until the legislation of Congress known as the Taylor Grazing Act in 1934, U.S.C.A. Title 43, Public Lands, Chap. 8A, sec. 315 et seq., there was a limited regulation of such grazing by state statutes enacted under the state's police powers. See Nevada's Stock Watering Law of 1925, secs. 7979–7985, N.C.L. 1929, and its Grazing Law of 1931, sec. 5581, et seq., N.C.L.1931–1941 Supp., and earlier statutes restricting the grazing of sheep, secs. 3999, 4003, N.C.L.1929, etc. After the adoption of the Taylor Grazing Law and the regulations of the secretary of the interior made pursuant thereto (see Brooks v. Dewar, 60 Nev. 219, 106 P.2d 755; Brooks v. Dewar, 61 S.Ct. 979, 313 U.S. 354, 85 L.Ed. 1399), livestock could be grazed on the public domain only under licenses or permits granted by the secretary of the interior through local offices generally known as Taylor Grazing offices and later through the Bureau of Land Management. An essential requisite for obtaining such license or

domain from April 1 to October 31 each year. The court found the fact to be that the permit was only for 2,350 head of cattle for five months each year, but further found that this fact was known to plaintiff on May 31, 1950 when he made out his second $25,000 check to defendant. Plaintiff had, as a matter of fact, obtained copies of defendant's Taylor Grazing permits from the grazing office the day before and had them in his possession the day before he issued the said second check. The district court, while holding that there was some question as to plaintiff's knowledge of the Washoe county taxes and while he was not chargeable with knowledge of the hay and grain production or reservoir costs, as hereinafter discussed, clearly stated that the defendant was chargeable with knowledge of the extent of the Taylor Grazing rights. While it is true that a subsequent finding made by the court is inconsistent with this language, we do not feel justified in ignoring it and must conclude that plaintiff did not act in reliance upon this representation nor could he have been prejudiced thereby. This item thus becomes eliminated from the case.

(b) It is next alleged that defendant represented that the ranch comprised an acreage of 19,400 acres of deeded land but that the same did not exceed 15,000 acres of deeded land. The court found the representation to be 17,500 to 18,000 acres and the actual ownership to comprise 17,632.62 acres. As stated in its opinion: "The court has found [this] alleged misrepresentation to be substantially correct." It is clear then that this item of alleged misrepresentation affords no ground for relief.

(c) The next misrepresentation alleged is that the

permit was the ownership of a base property supplying adequate winter feed commensurate in extent with the summer grazing license or permit. Variations of the picture under which a "winter range" is involved or under which owned and fenced or unfenced mountain pasture is involved or under which the entire annual operation involves only land owned by the cattle raiser or in which the range lands are checkerboarded by reason of the ownership of alternate sections by the Central Pacific Railroad, do not enter into the instant cattle operation.

taxes did not exceed $2,200 annually, whereas the taxes for the fiscal year 1949–1950 were $4,388.60. The court's finding of fact No. 4 finds that the taxes on the real property, including those in Washoe County, Nevada, and Lassen County, California, were $2,563.43 for the fiscal year 1949–1950. It can hardly be said that the difference is material in view of the magnitude of the transaction and in view of plaintiff's admitted possession of the California tax receipts at the time he made the second $25,000 attempted payment, and in view of his actual production from his own file at the trial, of the Nevada tax receipts, although he denied knowledge of the latter or any knowledge of how they had come into his possession. It is clear that the court did not base, and could not have based, its judgment for a rescission of the contract upon a misrepresentation of the amount of taxes assessed against the ranch or upon the plaintiff's reliance on such alleged misrepresentation.

(d) This element is discussed below.

(e) It is here alleged that the defendant represented that he had constructed upon the ranch, at a cost of $75,000, a new reservoir for storing the waters of Smoke Creek and Chimney Creek and that said new reservoir impounded 3,500 acre-feet of water, but that its actual capacity did not exceed 1,800 acre-feet. As to the capacity of the reservoir, the court said: "The court has found that [this] misrepresentation was not relied upon by the plaintiff in entering into the contract to purchase the ranch and in making the down payment of $25,000 thereon." Elsewhere the court said: "It is clear therefore that this representation was not relied upon." The alleged representation as to the reservoir's capacity is accordingly eliminated from the case. The court, however, found that the actual cost of the reservoir, as reflected in the defendant's proofs filed with the Division of Water Resources, Department of Public Works, State of California, was $21,366.15. In so holding the court applied "proper accounting methods" under which it eliminated from the cost of the reservoir items included

by the plaintiff which were the cost of "certain heavy equipment purchased for the job [and which] remained after the job was completed." We find it unnecessary to discuss this item further because of our conclusion that even with the elimination of items (a), (b) and (c) and that part of item (e) having to do with the reservoir capacity and any doubt that we may have as to that part of item (e) having to do with the cost of the reservoir (not pleaded by plaintiff as a misrepresentation), the record contains ample, substantial evidence to support the findings, conclusions and judgment under item (d).

(d.) As to this item the second amended complaint alleges: "That defendant further represented and stated to this plaintiff that to run cattle on said ranch required approximately one ton of hay annually per head; and, further, that said ranch would produce hay to carry the allowed 2,850 head of cattle through the winter months and at all other times when necessary to feed hay to cattle; and, further, that the said defendant was putting up 2,500 tons of hay on said ranch each year; and that in addition, 1,500 acres were now being farmed to grain each year." It is then alleged: "That in truth and in fact said ranch, while owned by the defendant, and for more than three years continuously preceding defendant's ownership did not yield or put up in excess of 1,000 tons of hay, and not more than 500 acres of said ranch had ever been farmed to grain in any one year." There follow the usual allegations that the representations were false and were known by defendant so to be and were made to induce plaintiff to enter into the contract and make the down payment of $25,000 and did induce plaintiff so to do; that plaintiff relied implicitly upon said representations, had no opportunity to investigate and did not investigate their truth but accepted them as true and would not otherwise have entered into the contract or made the payment.

The defendant categorically denied making any of the representations. There was much evidence with reference to the amount of hay required and the amount of

supplemental feed required to winter cattle upon the property. The subject is also discussed at length in the briefs of counsel. Although of general interest to livestock men, discussion of the point is unnecessary for the purposes of this opinion. It may be noted in passing, however, that the number of tons of hay per cow for winter feeding depends upon the severity of the season, the length of the feeding season and other factors. On the whole plaintiff's witnesses agreed with the formula of one ton per head. We depart, however, from the realm of expert and practical opinion on this point to representations of fact as to tonnages of hay produced and acreages put into grain.

Plaintiff, throughout examination by his own counsel and a rigid cross-examination by defendant's counsel, steadfastly maintained that defendant had repeatedly represented that the ranch produced 2,500 tons of hay and that defendant himself had put up 2,500 tons of hay per season on the ranch. He as steadfastly maintained that defendant had represented that 1,500 acres had been put into grain; that he made it clear to defendant that he was relying on such representations; that he had no knowledge of his own on the subject and that he had no personal experience in ranching or livestock raising. This was substantial evidence upon which the court was entitled to rely,[3] though in some respects weakened by cross-examination and though denied in its entirety by defendant. It clearly appears that said representations,

---

[3]Although the district court found that plaintiff was charged with the knowledge that the ranch had a Taylor Grazing permit for only 2,350 head for five months and not a permit for 2,850 for seven months, even the 2,350 head permit would lend some support to plaintiff's reliance on defendant's representation of a 2,500 ton hay production. 2,500 tons of hay, plus the grain production, would, under the evidence, reasonably fill out the picture for a complete livestock operation. If it should be said that this would indicate a surplus of supplemental feed, we may refer to evidence (1) that in a long feeding season more than one ton to the head might be required and that there are recurring dry seasons resulting in underproduction, and (2) to plaintiff's testimony of defendant's statement that there would be surplus hay to sell.

found by the trial court to have been made, were false.

The hay producing portions of the ranch comprise four separate units—the main Smoke Creek Ranch where the headquarters were situated, the Lower Smoke Creek Ranch, some ten miles to the south, the Shinn Ranch, some ten miles to the north and Rush Creek Ranch, some miles to the northwest of Smoke Creek. The range land lies 15 to 18 miles to the north and east in the neighborhood of what is known as Painter Flat. In this neighborhood are some 20 individual parcels owned by defendant. They contain springs available for stock water and control a grazing area of some 40 square miles. The main sources of irrigation are Shinn Creek and Smoke Creek, which flow into a reservoir about a mile and a half north of the Smoke Creek Ranch. The main hay area, as well as the grain lands, lie below and south of this reservoir. The hay lands lie in the main along a valley that varies in width from less than a fourth to approximately a half mile, and extends for a distance of eight miles or more.

Two witnesses, entirely familiar with the haying operations on the four units, both prior to and during the entire period of the defendant's occupancy thereof, testified in detail to the amount of hay produced on each unit during those years. The details went to the number of bales and the number of tons of hay produced. The highest aggregate production of hay in any of those years was 1,148 tons, the lowest fell to below 900 tons. Testimony as to the number of cattle fed on the ranch during varying periods, partly with additional feed that had been purchased, lends no support to defendant's conclusion that much greater tonnages of hay must have been produced. The hay production was less than one half that represented by defendant. The highest acreage put into grain during any of those years was 640 acres, as against defendant's representation of 1,500 acres— again substantially less than one half.

To escape this situation, defendant earnestly contends that not only did plaintiff have full opportunity to make

a personal examination of the premises but made such examination and was thereby precluded from contending that he entered into the contract in reliance upon defendant's representations.

As to plaintiff's examination of the premises it would appear that plaintiff was on the ranch properties twice before he entered into the contract. On the first occasion he drove to the ranch with defendant, walked across the Lower Smoke Creek meadow which was about 10 miles south of the main ranch and spent about 10 or 15 minutes there. They then drove north to the main ranch and stopped at a little knoll overlooking the fields. At this time defendant explained that "this meadow is eight miles long." He explained further that the cattle ranged in summer on an area near Painter Flat some 15 to 18 miles northeast of the ranch. During most of the remainder of that trip plaintiff sat in the car. They were there through the middle of the day, some two or three hours, and then drove back to Reno. On this trip they did not visit the Shinn Ranch, which is some nine or ten miles north of Smoke Creek.

On his second trip to the ranch he was there with defendant for four or five hours. They drove to the reservoir approximately one and one half miles to the north of Smoke Creek and then some 10 miles north to the Shinn Ranch. They walked into the meadow on the Shinn Ranch and were there about 30 minutes. On this occasion the defendant said that he put up 500 tons of hay on the three smaller ranches—the Shinn Ranch, Rush Creek and Lower Smoke Creek. (These three ranches produced 245 tons in 1947 and 238 tons in 1948.) On this occasion they drove to the gate of the Rush Creek Ranch and looked at it from the gate. They were able to see only part of the meadow. Examination of the grain areas on both of these visits was even more cursory and casual than the examination of the hay lands. Plaintiff had flown over the ranch in his private plane a number of times, but at an elevation of 16,000 feet. Even assuming that this referred to elevation

above sea level, this was still over 11,000 feet above the ranch. Plaintiff was not even sure that he had located the ranch itself from the air. We should add that defendant never refused to show plaintiff any part of the ranch that plaintiff desired to see, and that any request by plaintiff to see any particular part of the ranch was complied with by defendant. We add a few further facts because defendant places great stress upon them. Plaintiff was apparently a businessman of ability and acumen, having made a success in the trucking business, a substantial part of which was devoted to hauling livestock. Though not operating it himself he owned a small ranch in California. He exhibited a knowledge of the value of cattle and of ranch machinery, as well as some knowledge of how much feed per head was required to carry cattle over the winter. In his business office he kept a quantity of legal forms, which he was accustomed to use in his business transactions. He had counsel employed by the year. Many other facts appear, all of which have received our consideration but which we do not deem it necessary to enumerate.

Under the above circumstances defendant insists that the case comes directly within the rule enunciated in Carpenter v. Hamilton, 18 Cal.App.2d 69, 62 P.2d 1397, 1399, as follows:

"Upon the question of knowledge it is held, generally, that where one undertakes to investigate the property involved or the truth of the representations concerning it and proceeds with the investigation without hindrance, it will be considered that he went far enough with it to be satisfied with what he learned. Mr. Pomeroy says, in speaking of one who has undertaken to make an inspection of the property, 'The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was mislead.' 2

Pomeroy's Equity Jurisprudence (3rd Ed.) § 893. 'One ground of this latter branch of the rule is the practical impossibility in any judicial proceeding of ascertaining exactly how much knowledge the party obtained by his inquiry; and the opportunity which a contrary rule would give to a party of repudiating an agreement or other transaction fairly entered into, with which he had become dissatisfied.' Id. If it fairly appears from the evidence that the buyer undertook to investigate for himself the matters as to which representations had been made, he cannot be allowed to later claim that he acted upon the representations, even though he voluntarily abandoned his investigation before it was completed."

Defendant also refers to an annotation entitled "Fraud predicated upon vendor's misrepresentation of physical condition of real property," appearing at 174 A.L.R. 1010, and particularly to the following at 1037 Id.

"It is, of course, a well settled rule that, in order to secure redress, the person to whom representations were made must have relied upon them. Obviously, no purchaser who relies upon his own investigation may successfully assert that he relied upon representations made to him by his vendor. In this connection there is a doctrine which has received the approval of a substantial majority of the courts to the effect that if a purchaser makes a personal investigation which is free and unhampered and the conditions are such that he must obtain the information he desires, he is presumed to rely upon his own investigation rather than on representations made to him by his vendor."

It is important to note the construction and limitation of the Pomeroy rule as expressed by the California court in the Carpenter case—that the buyer cannot be allowed later to claim that he acted upon the representations *if it fairly appears from the evidence that he undertook to investigate for himself the matters as to which the representations had been made.* And the rule cited from

the A.L.R. annotation still leaves us with the very question presented, which is: "Did plaintiff rely upon his own investigation?"

The Carpenter case refers with approval to the early California case of Dow v. Swain, 125 Cal. 674, 58 P. 271, the rule of which has been approved in many later California cases, and as late as Blackman v. Howes, 82 Cal. App. 2d 275, 185 P.2d 1019, 174 A.L.R. 1004, q.v. It has stood the test of time in California, has not been questioned in other jurisdictions, and we believe it to be good law:

"I do not subscribe to the idea that under all circumstances an actual examination by the buyer will shield the wrongdoer from an action for damages. Every case must be judged for itself, and the circumstances which warrant or forbid relief cannot be scheduled. If the seller knows the facts, and the buyer is ignorant, and to the knowledge of the seller the buyer relies upon the representations, I see no reason why relief should not be granted, although an imperfect examination was made. It may have been imperfect because of the representations." [125 Cal. 674, 58 P. 273.]
See also Heller v. Melliday, 60 Cal.App.2d 689, 141 P.2d 447; Kramer v. Musser, 57 Cal.App.2d 942, 136 P.2d 74; Tracy v. Smith, 175 Cal. 161, 165 P. 535.

The trial court concluded that the view of the property had by plaintiff could not show how much of the ground had been seeded to grain or how much hay it produced. From what we have said as to the extent of the examination and from our brief descriptive sketch of the property itself, it cannot be said that this determination was without substantial support. This being so, the situation appears to be brought directly within the rule of Dow v. Swain, quoted above, and is at the same time not in violation of the rule of Carpenter v. Hamilton, supra.

In the last analysis appellant's position resolves itself into the contention that plaintiff's testimony is incredible. The trial court did not find it so—and this applies not only to the representations made, but also to plaintiff's reliance on them. See Zimmerman v. Burchard-Hulburt Inv. Co., 111 Minn. 17, 126 N.W. 282, and Woodward v. Western Canada Col. Co., 134 Minn. 8, 158 N.W. 706, L.R.A. 1917 C, 270. Each party not only testified at length on his own behalf, but was subjected to long and rigid cross-examination. We are precluded by our long recognized rule from saying that the learned trial judge should not have believed the plaintiff's testimony. What this court might have found if it had been the original trier of the facts is not pertinent to this appeal.

Defendant's contention that the issuance of the second $25,000 check was a waiver necessarily falls from what we have said above. At the time it was issued, whatever may be said of plaintiff's knowledge of the true facts as to the extent of the grazing permit and the amount of the taxes on the property, plaintiff did not know that the representations as to the production of hay and acreage of grain were untrue. Without such knowledge or discovery there could be no waiver. 12 Cal.Jur. 794, Fraud and Deceit, sec. 58. Heller v. Melliday, 60 Cal.App.2d 689, 141 P.2d 447.

Many of the assignments of error have to do with those items of misrepresentation which we have eliminated from consideration by reason of the opinion and findings of the trial court. These do not require discussion. Other assignments have been duly considered and found to be without merit. The numerous authorities cited by appellant have all had our careful consideration.

Defendant cross complained that by reason of plaintiff's failure to purchase in accordance with the contract defendant had been compelled to sell the ranch at a loss

of $35,000. His appeal from the judgment and from the order denying his motion for new trial assign error in denying him a judgment for this sum. Our affirmance of the judgment awarding plaintiff a rescission and a return of his down payment necessarily carries with it an affirmance of the denial of the affirmative relief sought by defendant.

The judgment and the order denying new trial are affirmed with costs.

EATHER, C. J., and MERRILL, J., concur.