RALPH KING, Appellant, v. THE B O A R D OF REGENTS of the UNIVERSITY OF NEVADA, Respondent.

No. 3532

November 17, 1948.                    200 P.2d 221.

534

*James T. Boyd, D. W. Priest, Oscar Zapf* and *Brown & Wells,* all of Reno, for Appellant.

*Alan Bible,* Attorney General, and *George P. Annand* and *Homer Mooney,* Deputy Attorneys General, for Respondent.

*Kendrick Johnson,* of Reno, amicus curiae.

## OPINION

By the Court, BADT, J.:

This appeal presents for our determination the validity of the act of the legislature creating an advisory board of regents of the Nevada State University. It is chapter 68 of the Statutes of Nevada of 1947 and, being brief, is herewith set forth in full:

"An Act creating an advisory board of regents of the Nevada state university, and other matters properly relating thereto. [Approved April 1, 1947]

"Whereas, There are residents of the State of Nevada who have distinguished themselves in the business, professional, and cultural life of the State and nation, and whose counsel may be sought by the elected regents of the University of Nevada in the interests of the University; now, therefore,

"*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

"Section 1. There is hereby created a board to be known as the board of advisory regents of the University of Nevada. Said board shall consist of not more than seven members. The term of office of said board shall be four years from the date of appointment, and until their successors are appointed.

"Sec. 2. The advisory board of regents so appointed shall be bona fide residents of the State of Nevada and shall be appointed by the governor after nomination of such persons to the governor by the elected board of regents. The appointment of such persons shall not be valid unless they shall have been nominated by an official act of the elected board of regents.

"Sec. 3. The advisory board of regents so appointed shall act in an advisory capacity to the elected board of regents and shall be entitled to all the rights and privileges, including travel and incidental expenses, of the elected regents, but shall not have a determining vote on

any matter properly under the control of the elected board of regents.

"Sec. 4. No provision of this act shall be construed to be in derogation of the constitutional authority of the elected board of regents to administer the affairs of the university.

"Sec. 5. This act shall become effective from and after its passage and approval."

The board of regents of the university sought an opinion of the attorney general and requested an answer to the following three questions: (1) Is the act constitutional? (2) If the act is constitutional, does it make it mandatory for the regents to make nominations to the governor? (3) Does the advisory board have a vote in the elected board of regents? The attorney general answered the first two questions in the affirmative and the third question in the negative. Thereupon the plaintiff brought this action, as a taxpayer, to enjoin the regents from nominating the advisory board pursuant to section 2 of the act, claiming that the act violated constitutional provisions vesting the control of the university in an elected board of regents. The constitutional provisions involved are as follows:

"Art. XI, Sec. 4. The legislature shall provide for the establishment of a state university, which shall embrace departments for agriculture, mechanic arts and mining, to be controlled by a board of regents, whose duties shall be prescribed by law."

"Art. XI, Sec. 7. The governor, secretary of state, and superintendent of public instruction shall, for the first four years and until their successors are elected and qualified, constitute a board of regents, to control and manage the affairs of the university and the funds of the same, under such regulations as may be provided by law. But the legislature shall at its regular session next preceding the expiration of the term of office of said board of regents, provide for the election of a new board of regents, and define their duties."

■ The district court made a preliminary restraining order restraining the regents from nominating persons for appointment by the governor to membership in the advisory board. Subsequently the matter was argued, briefed and submitted to the district court whereupon it entered its order "that the demurrer interposed to plaintiff's complaint is sustained upon the ground that it appears from the face of the complaint that the legislative act complained of is constitutional * * * that this action is therefore and hereby dismissed; and that the restraining order heretofore entered is hereby dissolved and the undertaking thereon is hereby exonerated." The learned district judge filed no opinion giving the reason for his action other than stated. Plaintiff appealed "from the final judgment * * * and from the order sustaining the demurrer * * *." The order sustaining the demurrer is not appealable and the appeal therefrom is dismissed. There remains the appeal from the judgment of dismissal and from the judgment dissolving the restraining order. N.C.L. sec. 9385.60. In their written briefs and in their oral argument counsel for both parties indicated that, irrespective of other points raised and discussed, it was clear that if the act in question is constitutional the judgment must be affirmed, but that if it is unconstitutional the judgment must be reversed, with instructions to enter judgment awarding a permanent injunction as prayed for by plaintiff. Even without such statement of counsel, we are satisfied that we should not be justified in attempting to avoid the constitutional question.

Pursuant to the constitutional mandate the legislature passed "An Act to provide for the election of the Board of Regents, to fix their term of office, and prescribe their duties," Stats.1869, c. 53, p. 134; "An Act to locate the state university [at Elko], and to provide for the control and maintenance of the same," Stats.1873, p. 166; and "An Act relating to the State University and matters properly connected therewith," Stats.1887, c. 37,

p. 42. Additional and amendatory legislation was enacted. As last amended, Stats.1945, c. 229, p. 448, section 3 of the act relating to. the state university recited the *powers and* duties of the board of regents as follows: (All emphasis in this opinion has been supplied unless otherwise noted.) 1. To prescribe rules for their own government and the government of the university; 2. To prescribe rules for the reports of officers and teachers; 3. To prescribe the course of study, time and standard of graduation, commencement and duration of terms, vacations, etc.; 4. To prescribe the textbooks and provide apparatus and furniture for the students; 5. To appoint a president of the university with certain prescribed qualifications; 6. To prescribe the duties of the president and fix his salary and the salaries of other teachers; 7. To require the president to establish and maintain training schools; 8. To control the expenditures of all moneys appropriated for the support and maintenance of the university and all moneys received from any source whatsoever; 9. To keep accounts of receipts and expenditures open to public inspections; 10. To report to the governor biennially a statement of all their transactions and of all other matters pertaining to the university; 11. To transmit with such report a copy of the president's biennial report; 12. To revoke diplomas under certain circumstances; 13. To accept gifts, grants, etc.; and 14. To sell or lease properties of the university under certain provisions and restrictions.

Although the constitutional direction to the legislature was to prescribe the *duties* of the regents, article XI, sec. 4, and the control of the first board was required to be under such *regulations* as may be provided by law, it does not appear that the foregoing act, or its predecessors, fixing the *powers and* duties of the board of regents has ever been attacked in this court nor is it attacked now, nor is this mention of the act intended to indicate any opinion of this court suggesting that any part of section 3 is invalid.

The legislature of 1947 also passed an act, Stats.1947, c. 244, p. 766, requiring all regular and special meetings of the board of regents to be open to the public. Other acts have been passed concerning the universtiy but none of them has been questioned in this court, other than the one now before us.

As noted above, the first subdivision of section 3 of the act of the legislature of February 7, 1887 prescribing "the powers and duties of the Board of Regents" is "to prescribe rules for their own government, and for the government of the University." The second subdivision empowers and requires the board of regents "to prescribe rules for the reports of officers and teachers of the University." While the record in this case does not disclose the precise activities of the board of regents, it is apparent that these rules for their own government and for the government of the university and for the reports of officers, etc., have been established by the elected board of regents. The 1948 University of Nevada Bulletin (which is a part of the official statutory reports of the regents to the governor) conforms in a general way to university bulletins published by all of the major universities in the country. It comprises some 367 printed pages. It may be assumed that the bulletin has been published from year to year in the regular course of the performance of the duties of the regents, officers, faculty, etc. Continued appropriations by the legislature and allowance of claims for this publication from year to year may be said to constitute legislative approval of the matters therein reported. Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399, 1403 (on certiorari from the United States Supreme Court to the Supreme Court of Nevada, 60 Nev. 219, 106 P.2d 755).

From the 1948 University of Nevada Bulletin we find that the board of regents has vested the administration of the university in the president, the university faculty, the faculties of the several colleges, and the deans and

directors of the colleges and schools and of the public service departments. The president of the university is its executive head and is chairman of the faculty and ex officio a member of all committees. It is his duty to secure, through the academic deans, directors of the various schools and other administrative offices, efficient, orderly and economical administration and healthful development of the university. The vice president acts in case of the president's absence or inability to act. The principal administrative officers are academic deans and the directors of the various schools who have immediate charge of the educational work. They secure estimates for the expenses of their departments and submit the same to the president. The academic and social welfare of the students is under the supervision, respectively, of a dean of women and a dean of men. The university faculty comprise the president, vice president, deans, librarian, registrar and instructors. Subject to the approval of the president and the board of regents, the university faculty has legislative jurisdiction in all matters of government, discipline and educational policy not delegated by it to the separate faculties and has in matters of educational welfare the right of review of the actions of the several colleges. The university faculty accomplishes much of its work through standing committees. The powers and duties of the college faculties, and certain limitations upon their powers and their relationship, respectively, to the president, the dean and the board of regents are specifically set forth. It should be noted moreover that there is not only a definite organization of the university faculty but similar organization of the separate college faculties, which make rules and regulations, formulate courses of study, entrance and graduation requirements, etc., for their respective colleges, which become fully effective as governing statutes when supported by the university faculty, the president and the board of regents. The

status of each "department" as the educational unit in the university is also definitely fixed. For general administrative work the chairman of the department is responsible to the dean of that college in which the chairman's major work appears.

The foregoing sketch is necessarily brief and is intended only to indicate the governmental and organization action taken under authority of the general provisions of sec. 7728, N.C.L., being section 3 of the act of February 7, 1887, defining the "powers and duties" of the board of regents. Other "powers and duties" fixed by sec. 7728 as set forth, indicating the extent of the control exercised by the board of regents by virtue of the constitutional grant of power and the acts of the legislature are of course widespread. The 1948 bulletin indicates a total enrollment of 2,305 students in the various colleges under about 160 members of the faculty. Under sec. 7730, N.C.L. the board of regents is required to hold four regular meetings in each year and may hold special meetings at the call of the chairman of the board. The board elects its own chairman. The university faculty meets at the call of the president. It is unnecessary to touch upon the very extensive real estate holdings comprising the campus and the extension and agricultural units with the attendant administrative and economical problems or the financial structure or the matter of receipts or disbursements of funds, all of which will be within the imagination of anyone who has even strolled through the campus of any university.

While at first blush the general organization for the administration of the affairs of the university may seem somewhat complicated, it appears to follow a rather fixed pattern with the supreme authority vested in the elected board of regents acting largely through the president to whom the deans and directors of the various divisions of the university are responsible. The deans in turn work through the chairman of instructional

departments, through committees of the faculty and through the general faculty, and faculties of the colleges sitting as legislative bodies. This careful gradation of authority and responsibility results in a central structure which still permits opportunity for individual initiative on the part of the highly trained men in the several colleges and departments. See 1948 University of Nevada Bulletin for further details.

It is with reference to such a structure with its coordinations, interrelationships and delicate mechanical adjustments that we must consider the effect of the actions of an advisory board of regents as contemplated by the act in question.

Respondent places the entire burden upon the appellant (and we see nothing to criticize in this) by pointing out well-recognized rules of construction—that state constitutions are limitations of the lawmaking power and that the legislature is supreme in its field of making the law so long as it does not contravene some expressed or necessarily implied limitation appearing in the constitution itself; that matters of policy or convenience or right or justice or hardship or questions of whether the legislation is good or bad are solely matters for consideration of the legislature and not of the courts; that courts must proceed with the greatest of caution before striking a solemn act of the legislature; that every presumption is in favor of its constitutionality and every doubt must be resolved in its favor. It is unnecessary to impress the court anew with these propositions. We have always adhered to them. But they but lead us to the problem. They do not help to solve it. "It is undoubtedly the duty of courts to uphold statutes passed by the legislature, unless their unconstitutionality clearly appears, in which case it is equally their duty to declare them null." State v. Arrington, 18 Nev. 412, 4 P. 735, 737. Nor does respondent present to us any case in which this court or any court in any of the forty-eight states has upheld any act of similar

purport; an act creating an appointive advisory board
to an elective office or board created by the constitution,
a board which has all the rights and privileges of the
duly elected and constitutionally authorized board except
the right of a "determining" vote.   Even though we
concede the elasticity of the constitution, as a living
thing, to be interpreted in the light of new and changing
conditions, even, though we may not condemn legislation
simply because the object or purpose is new (no matter
how astonishing or revolutionary) so long as a constitu-
tional limitation is not violated, the support of such a
drastic departure from the usual conception of the con-
stitutional "control" vested in a board is undoubtedly
weakened by its total lack of precedent.

■ It is not essential that any given limitation
of power be definitely expressed in the constitution.
"Every positive direction contains an implication against
anything contrary to, or which would frustrate or dis-
appoint the purpose of that provision.   The frame of
the government, the grant of legislative power itself,
the organization of the executive authority, the erection
of the principal courts of justice, create implied limita-
tions upon the lawmaking authority as strong as though
a negative was expressed in each instance * * *."   1
Cooley's Constitutional Limitations, 8th Ed., 177.   The
rule is here so logically expressed and has been so long
recognized and followed that it may at this time be
stated almost as a maxim.   State v. Arrington, 18 Nev.
412, 4 P. 735;  State v. Moran, 43 Nev. 150, 182 P. 927.
Nor is it weakened by recognition of the fact that certain
executive and judicial powers are often exercised by the
legislature, judicial powers by the executive and certain
legislative powers by the judiciary.   Examples of this
are so commonly recognized as not to require discussion.

The problem was at the very beginning of this con-
troversy recognized by the opinion of the attorney gen-
eral, which is by reference made a part of respondent's
brief.   Op.Atty.Gen.1946-1948, p. 269.   In answering

the query "Does the advisory board [under the provisions of the act in question] have a vote in the elected board of regents?" the attorney general held that if the act should be so construed it would be clearly unconstitutional but that where an act was open to two interpretations, one of which would render it constitutional and the other unconstitutional, that construction should be adopted which would save the statute, citing Virginia & Truckee R. Co. v. Henry, 8 Nev. 165. In advising that the statute would be unconstitutional if it should be construed as giving the appointed members of the advisory board a vote in the elected board, the attorney general referred to State v. Torreyson, 21 Nev. 517, 34 P. 870, 874, and said: "The action was a proceeding in quo warranto to try the validity of the attorney general's claim to act as a member of the regents of the state university, under and by virtue of an act of the legislature which provided that the governor and attorney general shall be ex officio members of the board of regents. The court held that under sec. 7 of article XI of the constitution the office of regent must be filled by an election of the people. The court said: 'The word "elected," in its ordinary signification, carries with it the idea of a vote, generally popular, sometimes more restricted, and cannot be held the synonym of any other mode of filling a position.' The attorney general then quoted the concurring opinion of BIGELOW, J., as follows:

"To hold otherwise would be to make the university the football of the legislature. If this appointment, extending over nearly four years, is valid, there is nothing to prevent the next legislature, if the composition of the board does not suit them, from making all the other state officers ex officio regents. There is no reason to suppose that the power, once admitted would stop with them, but might extend to county officers and to others. But if, in accordance with the requirements of the constitution, we hold that the regents must be

elected by the people, this places the institution upon a sure and safe foundation, that should eventually lead to the careful scanning of candidates, and the election of the best men for the positions."

We have no hesitancy in approving that part of the attorney general's opinion that construes the act as not vesting in the appointed advisory regents the right to a vote in the elected "board of regents." But again this does not solve but only leads us up to our main problem.

■ In State v. Douglass, 33 Nev. 82, 110 P. 177, 180, involving the validity of an act providing that the secretary of state be ex officio clerk of the supreme court, a constitutional office, the court said:

"Every constitutional officer derives his power and authority from the Constitution, the same as the Legislature does, and the Legislature, in the absence of express constitutional authority, is as powerless to add to a constitutional office duties foreign to that office, as it is to take away duties that naturally belong to it. The Legislature may do as it sees fit with offices of its own creation; may consolidate or abolish them; or may enact a statute making an office of its own creation ex officio to some constitutional office."

The court further said:

"It is well settled by the courts that the Legislature, in the absence of special authorization in the Constitution, is without power to abolish a constitutional office *or to change, alter, or modify its constitutional powers and functions*. People v. Bollam, 182 Ill. 528, 54 N.E. 1032; Koch v. Mayor [, etc., of City of New York], 152 N.Y. 72, 80, 46 N.E. 170; Lloyd v. Smith, 176 Pa. 213, 35 A. 199; Massenburg v. Commissioners, 96 Ga. 614, 23 S.E. 998; Thomas v. Owens, 4 Md. 189; State v. McDaniel, 19 S.C. 114; Troy v. Wooten, 32 N.C. 377; State v. Covington, 29 Ohio St. 102; Ford v. [Board of State Harbor] Commissioners, 81 Cal. 19, 22 P. 278; In re Bulger, 45 Cal. 553; Love v. Baehr, supra [47 Cal. 364];

Denver v. Hobart, 10 Nev. 28, 31; 29 Cyc. 1368; Cooley's Constitutional Limitations, (6th Ed.) pp. 78, 79.

"In People v. Bollam, supra, the court said: 'It is a well-established rule of constitutional construction that when the Constitution defines the circumstances under which a right may be exercised, the specification is an implied prohibition against the right of the Legislature to add to the condition. * * * Section 24 of article 5 of the constitution of 1870 says that "an office is a public position created by the Constitution or law," etc. The Constitution thus recognizes two classes of officers, one which is created by the Constitution itself, and the other which is created by statute. Where an office is created by statute, it is wholly within the control of the Legislature creating it. But when an office is created by the Constitution, it cannot be enlarged or lessened in scope by any statute, or be filled in any other manner than the manner directed by the Constitution. People v. Loeffler, 175 Ill. 585, (51 N.E. 785).' "

The immediate problem before us is to determine whether the act in question does or does not "change, alter, or modify [the] constitutional powers and functions" of the board of regents created by the constitution. If it does so, then under the well-settled rule approved in State v. Douglass, supra, we must hold the act invalid.

It is not denied that if the act had simply created an advisory board of regents who "shall be entitled to all the rights and privileges, including travel and incidental expenses, of the elected regents," to be nominated by the elective board and appointed by the governor, the attempted creation of such rights in an appointive board would contravene the constitutionally vested powers of the elective board. Do the so-called saving clauses elsewhere appearing in the act save it from this taint?

We think it clear that the restriction of the governor's appointive powers, under the act, to the nominees of the

elective board can have no such saving effect. Indeed the contrary is not urged by respondent. And if the present act is sound, would it not be just as sound if the legislature repealed the nominating provision? Or would it not be just as sound if, by its terms, the legislature itself made the appointments?

■ Is the provision that the appointive regents "shall not have a determining vote on any matter properly under the control of the elected board of regents" sufficiently indicative that the act in question does not in effect change, alter or modify the constitutional powers and functions of the elected board? Just exactly what the legislature had in mind when it referred to "a determining vote" is not clear. Nor is it clear as to what matters would be included in, and what matters excluded from, matters "properly under the control of the elected board of regents." The use of the terms would naturally indicate that the appointed regents should have some kind of a vote as distinguished from "a determining vote," and that they could have a determining vote on a matter that was not "properly under the control of the elected board of regents." It has been suggested in the briefs that the appointed board of regents could probably meet separately as such appointed board and vote upon what advice should be presented by the appointed board as a whole to the elected board as a whole. Such indeed might have been the intention of the legislature. It has further been suggested that the provision that bars a determining vote by the appointed regents "on any matter properly under the control of the elected board of regents" simply barred such vote when the elected regents were performing *any* of their constitutional functions in their management and control of the university and intended no distinction whatsoever between matters properly under their control and matters not properly under their control. Although the choice of words is undoubtedly an unhappy one, it would be our duty to give the words

such reasonable construction as would carry out the intent of the legislature as we might find it. For the purpose of our discussion we are willing to assume that the meaning of the restriction is that whenever any matter within the authority and functions of the elected board are put to a formal vote only the elected regents may vote thereon and none of the appointed regents may vote thereon.

There have been established at the University of Nevada by the board of regents a College of Arts and Science (which includes as a division thereof the School of Education), the College of Engineering (including the School of Mechanical, Civil and Electrical Engineering and the Mackay School of Mines), and the College of Agriculture. For the undergraduate work there are issued degrees of bachelor of arts and bachelor of science. Professional degrees of mechanical, civil, or electrical engineering may be conferred upon graduates of the University of Nevada or other universities under certain conditions. Certain curricula lead to the degrees of master of arts and master of science, but apparently no graduate work is offered leading to the doctor's degree. The maintenance of this situation, its modification, change or expansion all lie within the functions of the board of regents. With the growth of the state, if the history of other colleges may serve as a guide, the college will be greatly expanded, the curriculum broadened and enriched and graduate schools possibly developed. We are all familiar with the greatly expanded and broadened curricula and the graduate schools in our larger universities. The University of Nevada has no graduate school of law or of medicine. Such schools have not been thought to be warranted in the past, but their possibility in the future, even if in the far distant future, should not be ignored. We mention these as some of the larger problems that would have to address themselves to the board of regents. But without contemplating major changes or additions of this character,

constant problems as applied to the present structure must necessarily present themselves—courses to be added to or dropped from the curricula in the several colleges, the personnel of the faculties, the heads of departments, instructors, etc., their functions and their salaries, the interrelationships of the colleges, schools and departments—all of these with a thousand incidents and details must be provided for by the board of regents in the exercise of the functions of that board. The more important measures might entail months of investigation and study.

In all of this the members of the appointed advisory board, with "all of the rights and privileges" of the elected board, would participate. They would have the right to attend every regular and special meeting of the elected board and would be entitled to notice of the time and place of all meetings to insure their right to attend. They would have a right to participate in all of the discussions and deliberations. Their arguments could be as extended and their voices as loud. Only when any question came up to a vote would they be compelled to remain silent. The final or formal vote of the elected regents would occupy a matter of moments— so much time as it would take for a calling of ayes and noes from the five members present, or possibly from the four members or three members present. The investigation of the problem itself might involve an examination of many witnesses, interviews with the presidents or members of the faculty of other colleges, comparative studies, examination of data, plans, documents, etc. In all of this the members of the advisory board would participate under the act. Everything up to the final vote would be participated in by the constitutional elective board of five members and the legislatively created appointed advisory board of seven members. And if the creation of such advisory board of seven members by the legislature is valid and finds no restraint in the constitutional vesting of control in the

elective board, would not the creation of an advisory board of fourteen—or twenty-one or more—be just as valid?

Respondent insists that the situation created and presented by the act is simply one in which the elected regents would at the most be compelled to listen to unwanted advice; that they are not compelled to heed or to follow such advice; that if this situation is irksome, such is the fate of all public officers. Respondent suggests that the advice may be in writing and that the appointed advisory regents may never attend a meeting of the constitutional board. But it is patent that such suggestion of a possible minimizing of interference is not a logical defense of the act. "The right to be heard" runs through all our jurisprudence and through all the complexities of our government as an important right that carries with it the duty of the court, tribunal, board or officer "to hear," though not necessarily to be convinced. We are of course most familiar with this in court proceedings. After years of effort it was established in all administrative bureaus, through the federal administrative procedure act, whose final recent passage by Congress was largely the result of the efforts of a former chief justice of this court now serving in the United States Senate. It is recognized in minority representation, on various boards, in business as well as in government. It is illustrated in many functions of the general assembly of the United Nations, even though final action may be within the jurisdiction of the security council alone.

We cannot avoid a consideration of the far-reaching effect of our decision as a precedent in future cases were we to abdicate our right and our duty to declare this act void if the rights and privileges thereby accorded to the appointed advisory board "change, alter or modify" the constitutional powers and functions of the elected board. State v. Douglass, supra. Thus the

legislature in its wisdom might deem it advisable to provide for the appointment in some manner of an advisory board to the governor or an advisory board to the secretary of state or to the state comptroller or to the state treasurer in the exercise of its asserted constitutional power to determine the *duties* of those constitutional officers. Though in each case the legislature might provide that the advisory board be without a "determining vote" and that no powers were intended to be granted in derogation of the constitutional rights and powers of the particular officers but that it should otherwise have all of the rights and privileges of that officer, it would be manifest that such a situation would be contrary to the intention of the framers of the constitution. The governor in calling for legislation by the legislature or in vetoing acts passed by the legislature, in making various appointments, in considering requisitions for writs of extradition, in sitting as a member of the state tax commission, the board of paroles and pardons, and numerous other boards and in the performance of a hundred other executive and administrative functions, would be more than "irked" by "having to listen to unwanted advice." Such a situation would substantially change, alter and modify his constitutional powers and privileges. Further examples are unnecessary. Nor is the illustration farfetched, once we open the door to legislation of this nature. It is the more important that we stress this when considering the insistence of the attorney general, on behalf of the respondent, that "to give regents control of the University does not exclude the legislature from providing a means *for insuring that it shall perform its duties.*" And in answer to the contention of appellant that the board of regents would be rendered powerless to prevent the creation of claims for necessary expense incurred by members of the advisory board in attending meetings, respondent insists: "Even so, nothing in the constitution or laws of Nevada

exempts the elected board from *the supervision* of the legislature in this specific respect."

We are satisfied that the voting restrictions placed on the advisory board do not save the act.

Appellant places great reliance upon the case of Sterling v. Regents of the University of Michigan, 110 Mich. 369, 68 N.W. 253, 256, 34 L.R.A. 150, which involved an act of the Michigan legislature requiring the board of regents of the University of Michigan to establish a homeopathic medical college at Detroit and to discontinue the existing homeopathic college maintained as a branch of the university in the city of Ann Arbor, and to transfer the Ann Arbor branch to Detroit. The supreme court of Michigan said:

"Obviously, it was not the intention of the framers of the constitution to take away from the people the government of this institution. On the contrary, they designed to, and did, provide for its management and control by a body of eight men elected by the people at large. They recognized the necessity that it should be in charge of men elected for long terms, and whose sole official duty it should be to look after its interest, and who should have the opportunity to investigate its needs, and carefully deliberate and determine what things would best promote its usefulness for the benefit of the people. Some of the members of the convention of 1850 referred in the debates to two colleges (one in Virginia and the other in Massachusetts) which had been failures under the management by the state. It is obvious to every intelligent and reflecting mind that such an institution would be safer and more certain of permanent success in the control of such a body than in that of the legislature, composed of 132 members, elected every two years, many of whom would, of necessity, know but little of its needs, and would have little or no time to intelligently investigate and determine the policy essential for the success of a great university."

After calling attention to the fact that the legislature

could undoubtedly place certain conditions upon the expenditure of funds appropriated by it for the university, the court then refers to certain funds belonging to the university at the time of the adoption of the constitution and which were at that time its sole support. The Michigan constitution had vested in the regents the direction and control of all expenditures from such funds, and the court in vigorous language held that the legislature was without power to control these expenditures by dictating what departments of learning the regents might establish and where they should be located. It held that the expenditure of such funds vested in the regents, in absolute and unqualified terms. The court said. "The board of regents and the legislature derive their power from the same supreme authority, namely, the constitution. In so far as the powers of each are defined by that instrument, limitations are imposed, and a direct power conferred upon one necessarily excludes its existence in the other, in the absence of language showing the contrary intent."

Respondent properly distinguishes this case by calling our attention to the fact that the Michigan constitution contained no clauses similar to our own providing that the duties of the regents *shall be prescribed by law* or that the original interim board should control and manage the affairs of the University and the funds of the same "under such regulations as may be provided by law." Indeed the supreme court of Michigan points out that the Michigan constitution, article 13, secs. 1, 9, in creating the office of superintendent of public instruction and in creating the board of education in each case provided: "Their duties shall be prescribed by law," but did not so provide with reference to the regents of the university. The distinction of the Michigan case has force, however, only if we conclude that the Nevada act appointing the advisory board of regents is an exercise of the constitutional power to "prescribe the duties" or "define the duties" of the regents. But it is idle to say

that the act does no more than to prescribe or define the duties of the elected regents—creating, as it does, a new and additional appointive advisory board with all the rights and privileges of the constitutional elective board except certain voting rights. If we are correct in concluding that the defining of duties is one thing, and that the creating of a new board with equal rights and privileges (with the exception noted) is an entirely different thing, then the Michigan case (with whose philosophy we are in entire accord) becomes authority of the highest rank.

Before leaving the case of Sterling v. Regents of the University of Michigan, supra, we should note that the case was the culmination of many attempts of the Michigan legislature to direct the control of the university and that in each case the attempts were held to be without force. The earlier Michigan cases are referred to in the opinion in the Sterling case and reference is made to the very pertinent discussions contained in those cases, as well as the later cases of State Board of Agriculture v. State Adm. Board, 226 Mich. 417, 197 N.W. 160, and State Board of Agriculture v. Fuller, Auditor General, 180 Mich. 349, 147 N.W. 529.

Trapp v. Cook Construction Co., 24 Okl. 850, 105 P. 667, 669, involved the validity of an Oklahoma statute creating the state board of public affairs with authority to contract for and erect buildings for the board of agriculture acting as a board of regents for the state agricultural and mechanical college. The Oklahoma constitution, providing for and creating the board of agriculture, provided that such board "shall have jurisdiction over all matters affecting animal industry and animal quarantine regulations, and shall be the Board of Regents of all State Agricultural and Mechanical Colleges, and shall discharge such other duties * * * or may hereafter be provided by law." Const. art. 6, sec. 31. As in Nevada, the Oklahoma legislature enacted legislation further defining the duties of the regents.

The regents entered into certain construction work and issued vouchers in payment to the contractor, but the state auditor refused to draw his warrant upon the state treasurer for the same for the reason that the vouchers had not been approved by the legislatively created state board of public affairs. The court said: "From the foregoing it will be seen that the conflict arises out of the question of whether or not the Legislature had the constitutional authority to pass the act just referred to * * * or whether the designation by the Constitution of the board of agriculture as the board of regents of this college carried with it irrevocably, so far as the Legislature was concerned, the power and authority here sought to be exercised to contract and erect buildings for the state agricultural and mechanical college, and the auditing and direction of the disposition of all moneys appropriated therefor." The court then discusses the use of the clause of the constitution providing that the regents "shall discharge such other duties * * * as may be provided by law." The court says: "As we view it, additional duties may be required, but none vested by the Constitution may be taken away by the Legislature. In this conclusion we find support in the adjudication of a number of courts and authorities, of which we note the following: Cooley's Constitutional Limitations, 7th Ed., p. 98; State ex rel. Crawford v. Hastings, 10 Wis. 525; State ex rel. Kennedy v. Brunst, 26 Wis. 412, 7 Am.Rep. 84; Dahnke v. People, 168 Ill. 102, 48 N.E. 137, 39 L.R.A. 197; People [of the State of New York] ex rel. McEwan v. Keeler, 29 Hun. [N.Y.], 175; People ex rel. Bolton et al. v. Albertson, 55 N.N. 50; People ex rel. Kingsland v. Bradley, 42 How.Pr., N.Y., 423; People v. Raymond, 37 N.Y. 428; In re Railroad Commissioners, 15 Neb. 679, 50 N.W. 276; McCabe et al. v. Mazzuchelli, 13 Wis. 478; State ex rel. Martin v. Doyle, 38 Wis. 92; City of Watertown v. Robinson, 69 Wis. 230, 34 N.W. 139; State ex rel. Raymer v. Cunningham, 82 Wis. 39, 51 N.W. 1133; State

ex rel. Sweet et al. v. Cunningham et al., 88 Wis. 81, 57 N.W. 1119, 59 N.W. 503."

The court then discusses State ex rel. Crawford v. Hastings, cited in the foregoing list, and quotes from the opinion of "the able jurist Chief Justice Dixon" as follows:

"The question arises whether, under the foregoing provision of the Constitution, the Legislature have the power to create a second auditor or officer authorized to perform the same duties, whose concurrence is necessary before the acts of the constitutional auditor shall take effect. We think they have not, and that the functions of that officer cannot, in whole or in part, be transferred to, or be exercised concurrently, or otherwise, by any person or officer. It falls directly within the rule that the express mention of one thing implies the exclusion of another. Expressio unius est exclusio alterius. This rule applies as forcibly to the construction of written Constitutions as other instruments, and, if its observance ought in any degree to depend upon the character or importance of the instrument under consideration, then no other cases demand so rigid an adherence to it. A Constitution being the paramount law of a state, designed to separate the powers of government and to define their extent and limit their exercise by the several departments, as well as to secure and protect private rights, no other instrument is of equal significance. It has been very properly defined to be a legislative act of the people themselves in their sovereign capacity, and, when the people have declared by it that certain powers shall be possessed and duties performed by a particular officer or department, their exercise and discharge by any other officer or department are forbidden by a necessary and unavoidable implication. Every positive delegation of power to one officer or department implies a negation of its exercise by any other officer, department, or person. If it did not, the whole constitutional fabric might be undermined and

destroyed. This result could be as effectually accomplished by the creation of new officers and departments exercising the same power and jurisdiction as by the direct and formal abrogation of those now existing, and, although the exercise of this power by the Legislature is nowhere expressly prohibited, nevertheless they cannot do so. The people having in their sovereign capacity exerted the power and determined who shall be their auditor, there is nothing left for the Legislature to act upon. This principle or rule of construing Constitutions has been often laid down and acted upon by courts."

The similarity of that case to State of Nevada v. Douglass, supra, immediately commands attention. The Oklahoma opinion then proceeds as follows:

"This rule of construction extends to every part of the instrument, and, if a violation of it is allowed in the case of the auditor, it is difficult to see why it should not be in the case of any other officer or department. Thus, the Legislature might with equal propriety create new courts of justice, usurping and exercising the same power and jurisdiction as those established by the people, and a new executive, to correct the mistakes and control the action of the one chosen by them. It seems to us clear that the Legislature could do neither, and that so much of the act under consideration as attempts to transfer to the so-called comptroller the functions of auditor, and to clothe him with authority to control or reverse the acts of that officer, is unconstitutional and void."

State ex rel. University of Minnesota v. Chase, State Auditor, 175 Minn. 259, 220 N.W. 951, 954, involved the validity of a legislative act attempting to subject the control of university finances to the supervision of the statutory commission of administration and finance. The board of regents was incorporated by the territorial assembly of 1851 with the right "to govern" the university. By the state constitution all the "rights, immunities, franchises and endowments" so granted were

"perpetuated unto" the university. M.S.A.Const. art. 8, sec. 4. The court said:

"So we find the people of the state, speaking through their Constitution, have invested the regents with a power of management of which no Legislature may deprive them. That is not saying that they are the rulers of an independent province or beyond the law-making power of the Legislature. But it does mean that the whole executive power of the University having been put in the regents by the people, no part of it can be exercised or put elsewhere by the Legislature. In consequence, so far as L.1925, p. 756, c. 426, attempts to give the commission any power of supervision or control over university finances, it is in violation of article 8, sec. 4, of the state constitution and therefore inoperative."

The court noted that the original territorial act vested in the regents the power "to govern; that is, the power to control," citing authority for the synonymous use of the two words—the Minnesota regents being given the right to govern and the Nevada regents being given the right to control. We note again frankly that there was lacking in the Minnesota constitutional provision the reservation to the legislature of the right to fix the duties of the regents, but as above noted, encroachment on constitutional functions cannot be justified in the guise of defining duties, so that the lack of the Nevada clause in the Minnesota constitution does not weaken the authority of the Minnesota case.

Idaho has been faced with a similar conflict as to the right of the legislature to enter into the control of the University of Idaho by its board of regents. The Idaho constitution vested in the board of regents of the University of Idaho "the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, *under such regulations as may be prescribed by law*." Const. art. 9,

sec. 10. In State ex rel. Black v. State Board of Eluca-
tion, 33 Idaho 415, 196 P. 201, the court held that such
regulations must not be of a character to interfere
essentially with the constitutional discretion of the
board, under the authority granted by the constitution.
So it was held that there was no obligation resting upon
the board of regents to pay the state treasurer the pro-
ceeds of the sale of property belonging to the university,
in the absence of conditions contained in an appropria-
tion which, by being accepted, raised an implied contract
on the part of such board, and held that such proceeds
of sale might be paid directly to the treasurer of the
university. The court held that the board of regents,
while functioning within the scope of its authority, is
not subject to the control or supervision of any other
branch, board or department of the state government.
Note that the Idaho constitution permitted the legisla-
ture to prescribe regulations, while the Nevada con-
stitution authorized the legislature to define duties. The
further the distinctions between the cases are pointed
out the more finely is the line drawn. In the later Idaho
case, Dreps v. Board of Regents of the University of
Idaho, 65 Idaho 88, 139 P.2d 467, 471, payment of salary
of a clerk of the board, a niece of one of the members,
was refused on account of the provisions of the Idaho
nepotism act. The action grew out of such refusal of
payment and the question presented to the Supreme
Court of Idaho was whether the legislature had the
power to make the nepotism act applicable to the board
of regents of the university. The Idaho territorial
legislature had created the University of Idaho and
defined the powers of the board of regents and, as in
the Minnesota and Oklahoma cases, the state constitu-
tion had perpetuated all of the rights, immunities,
franchises, etc., unto the said university. It was con-
tended that the above-italicized clause in the Idaho
constitution conferred certain lawmaking power on the
legislature. The court said:

"It is not believed that the framers of the constitution meant any such thing by using the words, 'under such regulations as may be prescribed by law,' for the reason that to give this clause such a construction would contradict and repudiate the terms of the preceding sentence and likewise impair the authority conferred by the territorial act, which was made a part of the constitutional charter and declared 'hereby perpetuated.' "

The court refers at length to Sterling v. Regents of the University of Michigan, supra, and State v. Chase, supra, [175 Minn. 259, 220 N.W. 954] in which the court held that the university in respect to its government "was put beyond the power of the Legislature by paramount law, the right to amend or repeal which exists only in the people themselves." The court also refers to People v. Barrett, 382 Ill. 321, 46 N.E.2d 951, in which it was held that the University of Illinois board of regents was not an agency or instrumentality of the state but a separate, corporate entity, which functions as a public corporation and was therefore entitled to employ its own counsel and advisor and that such functions were not the duty of the attorney general. The opinion discusses at some length the freedom of the institution from legislative control and the Illinois court's opinion appears to have strengthened the Idaho court's reliance upon the Michigan cases. We mention this case for the reason that counsel have discussed at some length in their briefs the extent of the public or corporate nature of respondent, particularly with reference to the applicability of the rules laid down in the Dartmouth College case. The Trustees of Dartmouth College v. Woodward, 4 Wheat., U.S. 518, 4 L.Ed. 629. We do not find it necessary to discuss this phase of the situation.

It is significant that of all of the authorities cited by both appellant and respondent not one has been submitted in which a legislative act creating an advisory board to a constitutional office has been involved. However, in Rich v. Chamberlain, 104 Mich. 436, 62 N.W.

584, 27 L.R.A. 573, there was involved the validity of an act creating an advisory board of pardons whose duty was to investigate applications of convicts and to report to the governor the result of investigations with their recommendations in respect to pardons or commutations or refusal thereof. Upon receiving the result of the examination and the recommendations of the advisory board "the governor may, at his discretion upon such conditions, with such restrictions and under such limitations as he may deem proper, grant the desired pardon, or commutation." Pub.Acts 1893, No. 150, sec. 6. The constitutional provision was that the governor "may grant reprieves, commutations and pardons * * * subject to regulations provided by law, relative to the manner of applying for pardons * * *." Const.1850, art. 5, sec. 11. The Supreme Court of Michigan, in holding the act to be a violation of the constitutional vesting of the pardoning power in the governor, said [104 Mich. 436, 62 N.W. 585]:

"This section of the constitution, in express terms, lodges the pardoning power with the governor, and with it the co-ordinate branches of government have nothing to do, except as the legislature may by law provide how applications may be made, and is entitled to a report of action taken. * * *

"The power conferred by this section of the constitution is practically unrestricted, and the exercise of executive clemency is a matter of discretion, subject, perhaps, to the remedy by impeachment in case of flagrant abuse. It cannot, however, be treated as a privilege. It is as much an official duty as any other act. * * *

"It is therefore of the highest importance to the public that this power should be carefully exercised, and that the fullest responsibility should rest upon the person to whom it is confided. The office of governor seems to be generally considered the proper one with which to lodge such responsibility, and the public have the right

to insist upon his performance of the duty. Not only is it beyond the power of the legislature to impose the duty upon others, but it should not in anyway lessen his responsibility to the public, when he sets aside the judgment of court and jury by opening the doors of a prison to a convicted felon. If the act in question does this, it should not be sustained. The effect of it is to establish a sort of tribunal open to convicts, where the question of whether they should be pardoned or be licensed to go at large may be tried. The conclusion reached,—i. e. the result,—accompanied by a recommendation, must be certified to the governor, who then grants or refuses a pardon, as he may think advisable. * * *

"But the vital defect in the act is that it tends to substitute the judgment of the board for that of the governor. *It can be truly said that the opinions of the board need not be controlling.* But the tendency is naturally to offer an opportunity, if not an inducement, to an overburdened magistrate, to depend upon the judgment of a board in which he has confidence, and which has made a more careful investigation than he has made, and to act upon the recommendation of such board, *while the public have a right to the fullest exercise of his own understanding and judgment, which they have signified by their constitution that they desire.* This right should not be thwarted or placed in jeopardy by a law whose natural result may be expected to contravene the spirit of the constitutional provision."

In conclusion the court said:

"As we have already said, the subject is expressly removed from legislative interference, and we think that the law of 1893, providing for the advisory board, is clearly unconstitutional."

It is interesting to note, also, that the court remarked with reference to the act under consideration:

"It is however, a significant fact, and one that bears forcibly upon this case, that we have found no instance

where a board has been created by statute, but invariably by constitutional provisions."

Following this remark the court referred to the constitutional provisions in various states, including Nevada, in which under the constitution the governor, justices of the supreme court and the attorney general constitute the board.

Rich v. Chamberlain was cited with approval and quoted at length in Ex parte Ridley, 3 Okl.Cr. 350, 106 P. 549, 26 L.R.A.,N.S., 110, and in Ex parte Bustillos, 26 N.M. 449, 194 P. 886, and in Laird v. Sims, 16 Ariz. 521, 147 P. 738, L.R.A. 1915F, 519 (where the case was considered at length in the prevailing opinion and in the dissenting opinion, and apparently approved in both). In State v. Jenkins, 20 Wash. 78, 54 P. 765, the court held that the governor's pardoning power could not, by a legislative act creating a board of pardons with power to recommend pardons, be restricted or controlled, since the power granted the legislature to regulate and restrict did not confer the power to abridge the executive functions. The constitutional provision there read: "The pardoning power shall be vested in the governor, under such regulations *and restrictions* as may be prescribed by law." Const. art. III, sec. 9. The statute required an application for pardon to be made to the board and the board's recommendations to be made to the governor. These cases are in point only to a limited extent— both by reason of the varying constitutional provisions and by reason of the nature of the boards created by the several statutes under attack. There is, however, a distinct analogy. The foregoing cases consider the legislative appointment of an advisory pardon board with power only to investigate and recommend, under a constitutional provision vesting the pardoning power solely in the governor but with a right in the legislature to provide the manner of making the application, or to regulate, or to regulate and restrict. The instant case

considers the legislative provision for the appointment of an advisory board to the board of regents (with all rights and privileges of the elected board except the right to a determining vote) whose advice the constitutional board may or may not take, under the constitutional vesting of power to control the university in an elected board of regents whose duties shall be prescribed by law.

In State v. Arrington, 18 Nev. 412, 4 P. 735, this court held to be unconstitutional an act of the legislature extending for an additional period of two years the office of county assessor of Eureka County, for the reason that the constitution required such officers (even though the office be created by the legislature) to be elected by vote of the people. This case was relied upon in State v. Moran, 43 Nev. 150, 182 P. 927, in which case this court likewise struck down an act of the legislature authorizing district judges to suspend sentence on persons convicted of crime. It based its decision upon the constitutional provision providing that the governor, justices of the supreme court and attorney general "may, upon such conditions and with such limitations and restrictions as they may think proper, remit fines and forfeitures, commute punishments and grant pardons, after conviction * * * subject to such regulations as may be provided by law relative to the manner of applying for pardons." Const. article V, sec. 14. It is true that the power there reserved to the legislature, namely, to provide regulations relative to the manner of applying for pardons, differs from the legislative power to define the duties of the regents. The case is mentioned, however, by way of analogy. The power vested in the board of pardons by the constitution was held to be exclusive of any power in any other branch of the government, save only as to the right of the legislature to provide regulations relative to the manner of applying for pardons. So here the right of the regents to control the university, in their constitutional executive and

administrative capacity, is exclusive of such right in any other department of the government save only the right of the legislature to prescribe duties and other well-recognized legislative rights not here in question.

Does section 4 of the act save it? Section 4 reads: "No provision of this act shall be construed to be in derogation of the constitutional authority of the elected board of regents to administer the affairs of the university." While the wording of this section has been criticized as an attempt to control the action of this court as well as any other court or persons in *construing* the act, we are willing for the purpose of this opinion to read section 4 as meaning that the members of the advisory board are not intended to be given any powers in derogation of the powers of the elected board. But will that save the act? Let us assume for a moment that section 3 instead of denying to the advisory board a "determining vote," had expressly given them an equal voting right with the elected board, but section 4 was nevertheless retained. The entire statute would then reduce itself to an absurdity. Though not to so great a degree, the conferring of all other "rights and privileges * * * of the elected regents" on the advisory regents has a like effect. In other words, if the statute definitely creates powers in the advisory board in derogation of the constitutional powers of the elected board, clearly in violation of the constitutional vesting of powers in the latter, can that be cured by a legislative statement that the statute may not be constructed so to do, or that the statute is not intended to confer any such power? We think it clear that section 4 cannot have the effect of saving the statute. It cannot effectively provide that the statute does not accomplish precisely what the rest of the statute does accomplish.

Both appellant and respondent have referred to the debates of the constitutional convention to see whether any matters therein appearing would throw any light on the intention of the framers of the constitution with

regard to the extent of the control of the university to be vested in the board of regents. The discussion takes up a number of pages, but we think the most significant part appears in the following: Section 4 of article XI (after there had been eliminated by vote certain restrictions to white pupils and residents) was submitted in the following language:

"The legislature shall provide for the establishment of a state university, which shall be under the control of a Board of Regents."

Mr. Nourse then stated: "I like the general idea of that very much, only I would suggest to add to it, 'whose powers and duties shall be prescribed by the Legislature,' and not leave it to be inferred, perhaps, that they have absolute control. I will vote for it with that addition."

Mr. Crosman stated: "I will accept of that, although I think it would rather be inferred."

Mr. Collins later insisted that the section simply provides "that the Legislature shall appoint a Board of Regents, and said Board of Regents shall prescribe rules and regulations for the State University."

Mr. Crosman again insisted: "I want the Legislature simply to provide for the University, and then let it be under the control and management of the Board of Regents, as provided by law."

There was further discussion and the section was finally adopted by rejecting the clause *"whose powers and duties shall be prescribed by the legislature,"* and using instead the clause *"whose duties shall be prescribed by law."* Thus on the one hand the convention refused to grant powers to the legislature to restrict the *powers* of the regents but did grant the legislature the right to prescribe the *duties* of the regents. Mr. Nourse would have authorized the legislature to prescribe both the *powers* and *duties* of the regents "and not leave it to be inferred perhaps, that they have absolute control." In frankness

it must be said that the recourse to these debates affords scant assistance. The absolute control by the regents undoubtedly finds *some* restriction in the addition of the clause "whose duties shall be prescribed by law." The indication is just as clear, however, that the restriction is neither so rigid nor so far-reaching as it would have been had it authorized the legislature to prescribe their *powers.* Constitutional Debates and Proceedings, 585 et seq. It is interesting to note, however, that the act of February 7, 1887, "An Act relating to the State University and matters properly connected therewith," provides in section 3 thereof, "The *powers and* duties of the Board of Regents are as follows: First," etc.

The argument that the legislature has in several instances, commencing with the general act defining the duties of the regents, passed laws touching upon the control of the university and that such acts have not been questioned was likewise made in State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N.W. 951, 957. This was referred to as the argument of "practical construction," to which the court gave special attention and extended discussion because it had in that case so much factual basis. Reference is made to the very learned discussion there had and the conclusion there reached that when the inescapable meaning of the constitution is apparent from the instrument itself "it is not then permissible to adopt any different practical construction of a constitution, however long continued or well established, or however distinguished its authorship." (The authorship of the legislature.)

While it is urged by appellant that the act is invalid for the further reason that it divides and clouds responsibility for official acts done in the name of the elected board, that it will result in "buck passing" and shoulder shrugging and would discourage men from seeking or accepting the office of regent, and while these contentions have some measure of appeal, they go more to the

wisdom, judgment and policy of the legislation, in which field the legislature is supreme. Indeed so far as anything is presented in this case, no reason is shown why the legislature could not increase the personnel of the board of regents from five to seven or nine, or any other number. Nor has any constitutional objection been suggested, in case a large board should be too unwieldly and impracticable for the holding of numerous meetings for routine purposes, to the appointment by the regents of an executive committee whose acts would be subject to approval by the board. In such case, however, the members of the enlarged board would still, under the constitutional requirement, be elected by the people and responsible to them. They would not constitute a second and additional board "with all the rights and privileges" of the constitutional board and whose existence is sought to be justified (1) by calling them an "advisory" board, (2) by depriving them of a "determining vote," and (3) by a recital that the act shall not "be construed to be in derogation of the constitutional authority of the elected board."

It is urged by respondent that the act in question grants to the advisory board "rights and privileges" only, and no "powers," and thus cannot encroach upon the powers of the elected board. This distinction is too finely drawn and we are not impressed by it. The terms have often been held to be synonymous and it has been said that whatever may be the value of the distinction in ethics, in law it is "very shadowy and unsubstantial." See State v. Koch, 33 Mont. 490, 85 P. 272, 274, 8 Ann. Cas. 804; Memphis State Line R. Co. v. Forest Hill Cemetery Co., 116 Tenn. 400, 94 S.W. 69; Freligh v. Directors of Saugerties, 70 Hun. 589, 24 N.Y.S. 182.

Appellant contends that the creation of the advisory board, with provision for its "travel and incidental expenses," is invalid because said board is not a part of the general school system of the state and could not legally draw such expenses from university funds. Appellant also contends that this provision invades the

constitutional power of the elected board to control absolutely the financial affairs of the university, and that it is further invalid because the statute places no limit upon the amount of travel and incidental expense that may be incurred and designates no fund from which the same may be drawn and makes no appropriation therefor. For support of these contentions appellant relies upon State v. Eggers, 29 Nev. 469, 91 P. 819, 16 L.R.A., N.S., 630; Ingram v. Colgan, 106 Cal. 113, 118, 38 P. 315, 39 P. 437, 28 L.R.A. 187, 46 Am.St.Rep. 221, and other authorities and refers to constitutional provisions requiring appropriations to be made by law before the drawing of funds from the treasury. These contentions are of interest and not without force but in view of the conclusions reached on other points involved, we do not find it necessary to pass upon them.

Respondent insists that the unquestioned right of the legislature to appropriate the required funds for maintaining the university indicates that the elected board of regents was not vested by the constitution with exclusive and plenary control. However, the two processes are distinct. The power of the legislature to provide the requisite money and to limit and decrease the amount considered by the regents to be necessary is entirely a different function from the administration and control of the university itself.

From what we have said it is clear that we are of the opinion that it was the intention of the framers of the constitution to vest exclusive executive and administrative control of the university in a board of regents to be elected by the people and that the act creating the advisory board would change, alter or modify its constitutional powers and functions and cannot find its justification in the power of the legislature to define the duties of the elected board.

Accordingly, the complaint of plaintiff, appellant herein, seeking to enjoin the board of regents from making nominations to the governor for the appointment of members of the advisory board of regents, based upon

the contention that the act in question was void, stated a cause of action, and the general demurrer thereto should have been overruled. No facts are in controversy and the question is purely one of law. The judgment of the district court dismissing the action and dissolving the temporary restraining order is reversed and the case is remanded to the district court with instructions to overrule the defendant's demurrer and to issue, without bond, the permanent injunction prayed for. Neither party will recover costs in this court.

HORSEY, J., concurs.

EATHER, C. J., (dissenting) :

I regret that I am unable to concur in the conclusion reached by the majority opinion. Mindful of, and giving consideration to judicial precedents established by this court in numerous decisions, and being guided by law as thus announced, I am obliged to record my dissent.

A careful reading of the legislative act, the subject matter of this litigation, convinces me that by its provisions there is created an advisory board denuded of any right to vote on university affairs and possessing only the right to give counsel and advice to elected regents. The provisions of the act creating the advisory board do not usurp or transgress any authority or power vested in the elected board, nor do they confer any such authority upon the advisory board. Its provisions expressly disavow such intention. Nowhere within the four corners of this statute is there any provision making it the duty of the elected board of regents to accept or be bound by the counsel and advice offered by the advisory board. They are at liberty to accept or reject it at their pleasure and discretion.

If, as the majority opinion concludes, and upon this point alone I concur, the advisory board has no vote, then the law as I construe its provisions does not make it the mandatory duty of the elected board to request

advice or counsel from the advisory board, or if advice is offered, no legal mandate requires its acceptance. This being true, wherein does the act encroach upon the domain vested in the elected board?

In my opinion, therefore, with this premise established as a correct construction of the act, how can one cogently conclude that any provision of the act "changes, alters or modifies" the constitutional powers and functions of the elected board of regents?

I am not unmindful that under the act the advisory board is "entitled to all rights and privileges of the elected board." Such rights and privileges are restricted, however, to acting in an advisory capacity. The act by its provisions plainly indicates what the legislature had in mind in drafting and enacting this law, to wit: furnishing the University of Nevada, by way of counsel and advice, the assistance obtainable from residents of the state "who have distinguished themselves in the business, professional, and cultural life of the State and nation." All residents of Nevada are justly proud of their University. It is the earnest desire of all citizens that it continue to maintain its high standard among the colleges and universities of the United States. The people of Nevada, through its legislature apparently felt the need of furnishing to the elected regents a source of knowledge and experience that would be available, and at their command if desired. To supply such assistance the instant act became a law.

That the board thus created is purely advisory to elected regents is clearly demonstrated by the provisions of the act. The title of the act indicates that the proposed legislation "creates an advisory board of regents."

The "whereas" clearly discloses in the qualifications required by those to be appointed, that the board thus to be created is purely advisory. Observe the language used, after stating the type of resident to be appointed, it concludes, *"and whose counsel may be sought,"* by the elected board of regents; not whose counsel shall be

offered, not whose counsel must be followed, but whose counsel *may be* sought by the elected board of regents. (Emphasis added.)

Section 1 of the act creates the board and designates the board thus created "the board *of advisory* regents."

Section 2 prescribes the qualifications and manner of selection of members.

Section 3 enumerates the duties and specifically restricts the voting right of members of the advisory board. It is the provisions of this section, upon which is bottomed the legal conclusion that the legislature has thereby encroached upon the constitutional provisions vesting power in the elected board of regents. This because it is asserted the section grants to the advisory board "all the rights and privileges * * * of the elected regents."

To reach this pronouncement, emphasis is placed only on the isolated phrases "all the rights and privileges," and the related clauses are excluded. It is a cardinal rule of statutory construction that "courts have no authority to eliminate language used in a statute * * * but are bound to give effect, where possible, to all the language used." Heywood v. Nye County, 36 Nev. 568, 137 P. 515.

Section 3 of the act as well as the title, the whereas, and other sections must be considered together to correctly gather the legislative intent.

Section 3 reads:

"The advisory board of regents so appointed shall act in an advisory capacity to the elected board of regents and shall be entitled to all the rights and privileges, including travel and incidental expenses, of the elected regents, but shall not have a determining vote on any matter properly under the control of the elected board of regents."

Section 4 reads:

"No provision of this act shall be construed to be in derogation of the constitutional authority of the elected

board of regents to administer the affairs of the university."

By section 3 we have a statement in no ambiguous language that the advisory board "*shall act in an advisory capacity* to the elected board." Giving effect to this language which immediately precedes the words "shall be entitled to all rights and privileges" and being mindful of the court's duty to give the statute a fair and liberal construction, I am justified in concluding, that when their action in the first instance is restricted to acting in an "advisory capacity," that it is in such capacity they "shall be entitled to all rights and privileges" of elected regents.

The construction placed upon this section by the majority opinion recognizes that by its wording the board is to act in an advisory capacity, yet, by the language "shall be entitled to all rights and privileges" the legislature thereby changed the status of board members from "advisory capacity" to "regency" capacity. This construction would make the title of the act not sufficiently broad to give notice of the purpose of the proposed legislation and embracing matters not covered by the title, in violation of art. IV, sec. 17 of the constitution of the State of Nevada. The title of the act refers only to creating an "advisory board" and not a board with powers to actually function as regents, as determined by the majority opinion.

We have then a legislative act susceptible of two divergent constructions, one which invalidates the law; the other sustains it as valid. Under these conditions I apply the recognized rule of statutory construction, namely:

"In construing a statute to give effect to the intent or purpose of the legislature, the object of the statute must be kept in mind, and such construction placed upon it as will if possible, effect its purpose, and render it valid. * * * To this end it should be given a reasonable or liberal construction; and if susceptible of more than one

construction, it must be given that which will best effect its purpose rather than one which would defeat it, even though such construction is not within the strict literal interpretation of the statute." 59 C.J. sec. 571, page 961, citing State v. Martin, 31 Nev. 493, 103 P. 840; and State v. Eggers, 36 Nev. 372, 136 P. 100.

It is also to be noted that this court in construing the act must examine the legislative intent in enacting the law. "The legislative intent in enacting statutes must control, and rules of construction are but aids in ascertaining such intent." State v. Ducker, 35 Nev. 214, 127 P. 990. The wording of the act establishes beyond cavil that the intent was to have available to the elected board of regents a committee, or board, members who have "distinguished themselves in the business, professional, and cultural life and therefore possessing the necessary qualifications to give counsel to the regents if same was sought."

The legislature, realizing the possible limitations on their legal right to act under the constitution, and out of an abundance of caution, added section 4 to the act. The wording of this section may be inapt and could have been more clearly and definitely stated, yet it is the court's duty to give to it the meaning intended, if the same can be ascertained to a reasonable certainty. I am impressed with the conclusion that section 4 contains a declaration by the legislature that in enacting the law and creating the advisory board, no constitutional authority of the elected board of regents was thereby intended to be, or was in any manner or to any degree invaded or impaired. That therefore in any court proceeding that might be instituted challenging its legality, the legislature declared by section 4 the intent to confine the activities of the created board within constitutional limits. The mere fact the board created under the law would have the right to attend all meetings and participate in all discussions, and this perchance in a "loud voice," or that the members might be increased

to twenty or thirty, presents no constitutional objection, but purely one of legislative policy about which this court is not concerned. That the legislature might in future deem it advisable to provide an advisory board for the governor or other state officer is beside the question.

"The policy, wisdom, or expediency of a law is within the exclusive theater of legislative action. It is a forbidden sphere for the judiciary, which courts cannot invade, even under pressure of constant importunity." In re McKay's Estate, 43 Nev. 114, 184 P. 305, 309.

Again in the case of Magee v. Whitacre, 60 Nev. 202, 208, 96 P.2d 201, 106 P.2d 751, it is noted; "[The Supreme Court is] not authorized to enter into a determination of the constitutionality of a statute on a supposed or hypothetical case which might arise thereunder."

As I view this act I am unable to conclude that its provisions violate art. XI, sec. 4, or art. XI, sec. 7 of the constitution. Both sections recognize and direct legislative activity in connection with the duties of the board of regents. The constitutional provisions are not self-executing. For the last sixty years the legislature, acting under the constitutional mandate has enacted law regulating the details of control of the university by the board of regents.

By statutes 1887, c. 37, p. 42, the legislature defined the powers and duties of the board of regents. These included, among other things, the appointment of a president of the university. However, this power was expressly limited by prescribing the qualifications of the appointee. Section 12 of the act provides that all expenses incurred shall be passed upon by the state board of examiners. By statute 1913, c. 259, p. 402, the legislature again regulated the affairs of the university.

Statutes 1945 change the qualifications required of an appointee to the post of president, and made other changes authorizing regents to sell or lease university

property, subject to approval of the governor (who is not a regent). Chapter 167, Statutes 1945, the legislature asserted authority over the regents as to free tuitions. By statutes approved March 5, 1869, page 134, the legislature prohibited members of the board from being interested in contracts or expenditures created by the board. Statutes 1915, c. 204, p. 314, empowered the board of regents to establish emeritus positions at the university. Statutes 1915, c. 9, p. 10, authorized the regents to receive grants from the United States.

Statutes 1895, c. 43, p. 40, created an honorary board of visitors of Nevada state university. This board was required to meet annually at the university, inspect the buildings and equipment, inquire into the actual state of the discipline, instruction, police administration, and report same to the governor.

By sec. 7736, N.C.L.1929, the state superintendent of public instruction must visit the university every three months, inquire into its condition and management and report to the board of regents, with such suggestions as he may deem proper.

Are not these several legislative enactments but legislative construction of the constitutional mandate given to them under art. XI, sec. 4, and art. XI, sec. 7? And as a practical construction are they to be set aside unless clearly incompatible with the provisions thereof?

"Where a doubt may exist as to the proper construction to be placed on a constitutional or statutory provision; courts will give weight to the construction placed thereon by other co-ordinate branches of government." State v. Brodigan, 35 Nev. 35, 126 P. 680, 682; Seaborn v. Wingfield, 56 Nev. 260, 48 P.2d 881.

Again in the case of United States v. Curtis-Wright Export Corporation, 299 U.S. 304, 328, 57 S.Ct. 216, 225, 81 L.Ed. 255 the supreme court stated: "In Field v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 504, 36 L.Ed. 294, this court declared that '*the practical construction of the*

*constitution, as given by so many acts of congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land.'* The rule is one which has been stated and applied many times by this court. As examples, see Ames v. State of Kansas, 111 U.S. 449, 469, 4 S.Ct. 437, 28 L.Ed. 482; McCullouch v. Maryland, 4 Wheat. 316, 401, 4 L.Ed. 579; Downes v. Bidwell, 182 U.S. 244, 286, 21 S.Ct. 770, 45 L.Ed. 1088."

These several statutes by which the legislature has construed and enacted laws under the constitutional mandate pertaining to the university and board of regents have never been challenged, but acquiesced in by all. The legislative act under consideration no more offends the constitution, than the act creating a board of visitors for the university, or the act directing the superintendent of public instruction to visit the university and submit recommendations to the board of regents.

While the validity of these several statutes has not been challenged by court action, their provisions have been obeyed by those required to function thereunder for more than sixty years. A strict construction of the applicable constitutional provisions and the legislative authority thereby conferred, would lead to serious consequences.

The language of this court in the case of Worthington v. District Court, 37 Nev. 212, 142 P. 230, L.R.A.1916A, 696, Ann.Cas.1916E, 1097, seems appropriate to this subject matter. The court stated:

"That a statute has for years been enforced by the courts, without its constitutionality being challenged, may be considered as a recognition of its constitutionality, and courts will seldom entertain questions of the constitutionality of a statute recognized as valid in the jurisdiction of rights, and when the invalidity of the statute would lead to serious consequences."

For the reasons above set forth it is my opinion that the judgment of the lower court dismissing the action should be affirmed. In reaching this conclusion I am actuated for the above reasons and by the rule of statutory construction announced and adhered to by this court on many occasions, to-wit:

"Every presumption is in favor of the validity of a statute, and a statute will always be sustained if there be any reasonable doubt of its unconstitutionality." State v. Lincoln County, 60 Nev. 401, 111 P.2d 528.